**Susan REDDICK, Plaintiff–Appellant,**

v.

**Shirley S. CHATER, Commissioner of Social Security Administration, Defendant–Appellee.**

**No. 97–15111.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 12, 1998.

Decided Oct. 6, 1998.

Mark H. Lipton, Lipton, Warnlof & Segal, Walnut Creek, CA, for Plaintiff–Appellant.

John C. Cusker, Assistant Regional Counsel, Social Security Administration, San Francisco, CA, for Defendant–Appellee.

Before HUG, Chief Judge, FERNANDEZ and THOMAS, Circuit Judges.

HUG, Chief Judge.

This case involves a claim for Social Security disability benefits by Susan Reddick ("Claimant") who was diagnosed with Chronic Fatigue Syndrome ("CFS"). The Administrative Law Judge ("ALJ") found that Claimant suffered from CFS but that she was not disabled because the disease did not undermine her ability to perform substantial gainful work. The district court concluded that the ALJ's decision was supported by substantial evidence and granted summary judgment for the Commissioner. A principal issue in this case is whether the ALJ was justified in discounting the testimony of Claimant, her treating doctor, and an examining doctor concerning her disability from fatigue, and instead relying upon the testimony of two consultative examiners who concluded that she was not disabled. We have jurisdiction under 28 U.S.C. § 1291 and we reverse the judgment of the district court and remand with instructions to remand to the ALJ for an award of benefits.

## I.

### Procedural and Factual Background

Claimant filed an application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, alleging that she had been unable to work since October 4, 1989 due to CFS. Claimant's application was denied initially and upon reconsideration by the ALJ. The ALJ's decision became the final decision of the Commissioner when the Appeals Council declined review. Claimant filed a timely complaint for review by the federal district court. The parties each filed motions for summary judgment. The district court denied Claimant's motion and granted the Commissioner's. Claimant filed a timely appeal.

Claimant was born in 1956 and was thirty eight years old at the time of her hearing before the ALJ. Her education includes high school and some secretarial schooling. She last worked in 1989 as a payroll clerk at Adept Technology, processing time cards and preparing computerized reports. During her tenure at Adept, she complained of severe fatigue and an inability to stay awake to perform her work. She was put on disability in October 1989. At this time, Claimant was seeing her treating physician, Dr. Jacobson, who diagnosed a viral syndrome. In April 1990, he diagnosed a fatigue syndrome, with a possible viral illness and possible narcolepsy, also noting depression. Dr. Jacobson referred Claimant to a neurologist, Dr. Likowsky, who examined her in May 1990 and concluded that she probably had a fatigue syndrome, possibly with a psychological basis. Dr. Likowsky indicated that other possible diagnoses should be eliminated, and he ordered, among other examinations, a psychiatric evaluation. Claimant was examined by a psychologist, Dr. Cheng, in August 1990. She informed Dr. Cheng that she first experienced persistent fatigue in 1988. He noted that CFS required diagnosis by exclusion and recommended lab testing.

Dr. Jacobson diagnosed CFS in October 1990. In November, at the request of Claimant's long-term disability carrier, GroupAmerica Insurance, Claimant was examined by Dr. Charney, an internal medicine and infectious disease specialist. Dr. Charney found that Claimant met the major criteria for CFS established by the Centers for Disease Control ("CDC"). He also noted the presence of the Epstein–Barr antibody, frequently associated with CFS. Dr. Charney described "severe fatigue" and stated in his report to GroupAmerica that Claimant was disabled.

In January, 1991, Dr. Jacobson again diagnosed CFS. He noted that Claimant was tired and was undertaking aerobic exercises once weekly. He recommended exercise

three to five times per week for thirty to forty-five minutes and prescribed Motrin and Tagamet. Claimant was examined by Dr. Campen, a rheumatologist, in February 1991. Dr. Campen agreed with Dr. Jacobson's diagnosis of CFS, although noting that CFS is a somewhat nebulous term with multiple contributing factors. Dr. Campen agreed with Dr. Likowsky that psychological issues played a role in Claimant's condition. He encouraged Claimant to attempt to pursue employment alternatives.

GroupAmerica Insurance, which had referred Claimant to Dr. Charney in 1990, referred her to Dr. Ng in February 1992. After reviewing previous medical records and performing a history and physical, Dr. Ng agreed with Dr. Charney that Claimant met the CDC's criteria for CFS.

Claimant saw her treating physician, Dr. Jacobson, on several occasions during 1992 and 1993. Dr. Jacobson continued to diagnose CFS during this period, also noting swollen ankles and weight gain. Claimant had ceased aerobics and was attempting to exercise with a stationary bicycle and stair machine. A low-grade fever, one of the criteria for CFS, appears throughout the record. On June 4, 1993, Dr. Jacobson wrote a letter in response to a request from GroupAmerica, reporting that Claimant's specific limitations included myalgias and chronic debilitating fatigue, with a diagnosis of CFS. Dr. Jacobson noted that Claimant had been unable to work since October 1989. Three and a half years of extensive laboratory testing had excluded thyroid problems, diabetes, anemia, auto-immune diseases, lyme disease, hepatitis, renal failure, calcium disturbance, gall bladder problems and other diseases. The letter concluded: "The specific limitations that Ms. Reddick has that keep her from performing any occupation on a full time basis are her myalgias, but even more importantly her chronic debilitating fatigue."

Also in 1993, two Social Security consultative examiners saw Claimant in connection with her disability claim. Dr. Wood, of Health Analysis, Inc., examined Claimant and filled out an occupational health medical report in June. Dr. Wood diagnosed possible CFS, and noted exogenous obesity (174

pounds) and a depressive reaction. He found no functional limitations on hand or fine finger movements, sitting, standing, or walking. Dr. Wood noted that Claimant had "extreme lethargy," but made no comment on how lethargy would affect her ability to function.

Dr. Moseley, a psychologist, the second Social Security consultative examiner, saw Claimant in August 1993. Dr. Moseley did not have Claimant's medical file available to him, except for the recent occupational health report from Dr. Wood. After conducting some psychological tests, Dr. Moseley concluded that Claimant's scores "were well within the range necessary to carry out routine or customary job instructions." Based on the psychological results, he concluded that "[s]he may be expected to resume ... an eight-hour workday routine and 40–hour work week."

In response to a request by Claimant's attorney in June 1994, Dr. Jacobson indicated that Claimant's condition had not changed since his 1993 report.

## II.

### Standard of Review

■ We review a district court's order upholding the Commissioner's denial of benefits *de novo*. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir.1997). The Commissioner's findings may be set aside if they are based on legal error or are not supported by substantial evidence. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir.1996). Substantial evidence is more than a scintilla, but less than a preponderance. *Jamerson*, 112 F.3d at 1066. Substantial evidence is relevant evidence which a reasonable person might accept as adequate to support a conclusion. *Id.; Smolen*, 80 F.3d at 1279. In determining whether the Commissioner's findings are supported by substantial evidence, we must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir.1989); *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir.1985). If the evidence can reasonably support either affirming or reversing the Secretary's conclu-

sion, the court may not substitute its judgment for that of the Secretary. *Flaten v. Secretary of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir.1995).

## III.

### ALJ's Credibility and Disability Findings

To qualify for disability benefits, a claimant must show that a medically determinable physical or mental impairment prevents her from engaging in substantial gainful activity and that the impairment is expected to result in death or to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A). The claimant carries the initial burden of proving disability. *Id.* at § 423(d)(5); *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir.1989). Where the claimant establishes an inability to perform her prior work, the burden shifts to the Secretary to show that the claimant can perform other substantial gainful work that exists in the national economy. *Swenson*, 876 F.2d at 687.

Disability claims are evaluated according to a five-step procedure. *Baxter v. Sullivan*, 923 F.2d 1391, 1395 (9th Cir.1991). In step one, the Secretary determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). In step two, the Secretary determines whether the claimant has a "medically severe impairment or combination of impairments," as defined in 20 C.F.R. § 404.1520(c). If the answer is no, the claimant is not disabled. If the answer is yes, the Secretary proceeds to step three and determines whether the impairment meets or equals a "listed" impairment that the Secretary has acknowledged to be so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d). If this requirement is met, the claimant is conclusively presumed disabled; if not, the Secretary proceeds to step four. At step four, the Secretary determines whether the claimant can still perform "past relevant work." 20 C.F.R. § 404.1520(e). If the claimant can perform such work, she is not disabled. If the claimant meets the burden of establishing an inability to perform prior work, the Secretary must show, at step five, that the claimant can perform other substantial gainful work that exists in the national economy. 20 C.F.R. § 1520(f).

In this case, the ALJ determined that Claimant satisfied the criteria for steps one, two and three. He accepted the CFS diagnosis and acknowledged that Claimant had a "severe impairment." Because CFS is not a listed impairment as defined in 20 C.F.R. § 404.1520(d), he noted that the case was to be resolved at step four or five:

> The critical issue to be decided in this case is whether the claimant retains the residual functional capacity to return to her past relevant work or to do other substantial gainful work that exists in significant numbers in the national economy.

The ALJ did not proceed to step five, instead concluding at step four that Claimant failed to meet her burden of proving that she could not perform her past work as a payroll clerk. Claimant's accounts of the debilitating effects of her disease were determined not to be credible, in large part due to the ALJ's conclusion that the record reflected an ability to do housework, to undertake occasional weekend trips, and to engage in certain forms of exercise. The ALJ discounted the credibility of Claimant's treating physician and an examining physician, stating that their assessments were based on the subjective complaints of Claimant, who was found not credible. Both physicians had determined that Claimant was disabled. The ALJ instead relied on the assessments of the two Social Security consultative examiners, who he deemed to be more objective.

### 1. Claimant's Credibility

Claimant contends that the ALJ's credibility findings were unsupported by substantial evidence in the record. Claimant argues that the ALJ erroneously discounted her physical complaints, where the record indicates no inconsistencies or embellishments. Claimant also argues that the ALJ mischaracterized the record in an effort to discount the severity of her symptoms. In addition, the ALJ erred by failing to account for the effects of persistent fatigue on Claimant's

residual functional capacity to perform substantial gainful work.

■■■ We recognize that the ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir.1995). The ALJ's findings, however, must be supported by specific, cogent reasons. *Rashad v. Sullivan,* 903 F.2d 1229, 1231 (9th Cir.1990). Once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence. *Bunnell v. Sullivan* 947 F.2d 341, 343 (9th Cir.1991) (en banc). Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be "clear and convincing." *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir.1995) (internal quotation marks omitted); *Swenson,* 876 F.2d at 687. "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester,* 81 F.3d at 834; *Dodrill v. Shalala,* 12 F.3d 915, 918 (9th Cir.1993).

■■■ We conclude that the ALJ's finding that Claimant's activities indicate an ability to work is unsupported by the record. The activities Claimant described to her doctors, on disability forms, and at her hearing, were fully consistent with CFS. Her activities were sporadic and punctuated with rest. Even more prolonged undertakings might be consistent with the disease, as CFS is "characterized by periods of exacerbation and remission." *Cohen v. Secretary of Dept. of Health & Human Servs.,* 964 F.2d 524, 530 (6th Cir.1992) (describing the episodic nature of CFS). Several courts, including this one, have recognized that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations. *See, e.g., Cohen,* 964 F.2d at 530–31 (ruling that a claimant should not be penalized for attempting to maintain some sense of normalcy in her life); *Cooper v. Bowen,* 815 F.2d 557, 561 (9th Cir.1987)(noting that a disability claimant need not "vegetate in a dark room" in order to be deemed eligible for benefits). *See also Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir.1989) ("Many home activities are not easily transferable to ... the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication."). Only if the level of activity were inconsistent with Claimant's claimed limitations would these activities have any bearing on Claimant's credibility.

Our examination of the record shows that the ALJ has erred in characterizing statements and documents contained therein to reach the conclusion that Claimant exaggerated her symptoms. Examples include the ALJ's description of Claimant's aerobic activity and Tupperware sales,[1] and his characterization of an activities report completed by Claimant's sister-in-law.[2] In essence, the

---

1. The ALJ noted the following:

    "On the Disability Report which she completed for her initial interview she stated that her chronic fatigue syndrome caused her to be fatigued when she performed hard physical labor or aerobics. Hard physical labor or aerobics would fatigue an unimpaired individual and is not indicative of disability." After noting that Claimant could pay bills and keep the family books, the ALJ stated that "[s]he appears to have been doing Tupperware sales." Sections from Claimant's Disability Report, upon which the above comments are based, actually read as follows:
    "Very weak, tired extremely, very forgetful, body aches, extreme headaches, sore throat, so tired many times can't get out of bed for long hours/days. Become fatigued if I do hard physical work or aerobics." The same report notes that Claimant's activities include "rest,

    try to exercise at least 20 minutes a day." The report also notes that her treating physician, who diagnosed CFS, had recommended 20 minutes of exercise daily. Claimant's household chores included: "cook, three times a week (try), clean 10 minutes daily if I feel up to it. Shop. Have most food delivered. Odd jobs 20 minutes one time a week." With regard to Tupperware sales, Claimant noted that she "Tr(ies) to sell Tupperware." She indicated that she gives the Tupperware books to her sisters who bring the books to work and take orders. Her daughter writes up the orders, and her husband helps.

2. The ALJ provides the following description of the sister-in-law's activity report:

    "Ms. Eyre stated that the claimant paid the bills and did the household accounts. For recreation she enjoys going to Monterey, or out

ALJ developed his evidentiary basis by not fully accounting for the context of materials or all parts of the testimony and reports. His paraphrasing of record material is not entirely accurate regarding the content or tone of the record. We conclude that his approach and conclusions do not fully account for the nature of CFS and its symptoms.[3] *See, e.g., Sarchet v. Chater,* 78 F.3d 305, 307–09 (7th Cir.1996) (reversal required where ALJ's characterization of the record reflected misunderstanding of CFS); *Sisco v. Dept. of Health & Human Servs.,* 10 F.3d 739, 743–46 (10th Cir.1993) (reversal required where ALJ's credibility findings and interpretation of the record were not supported by substantial evidence).[4]

■■ There is considerable evidence in the record that detracts from the ALJ's conclusions. Nowhere has the ALJ pointed to affirmative evidence of malingering. Instead, he quotes a general comment by a consulting examiner, Dr. Ng, about the facility with which CFS symptoms can be exaggerated. This fact is true, and makes CFS cases difficult to adjudicate, but a general observation such as this in an insufficient reason to discount Claimant's credibility. In fact, Dr. Ng concluded that Claimant met the CDC's criteria for the diagnosis of CFS and was disabled.[5] Nor did the ALJ emphasize that four other doctors agreed with the CFS diagnosis, a fifth doctor diagnosed possible CFS, and a sixth diagnosed a fatigue syndrome. None of the examining doctors provided medical evidence countering the CFS diagnosis. Claimant tested positive for the Epstein–Barr antibody, which frequently correlates with CFS. She exhibited the constellation of symptoms often associated with CFS, including a persistent low-grade fever.[6]

to the movies, or out to dinner with friends. She reads a lot and goes to Bible study. She gets along with everybody."

The ALJ focused primarily on one question in the activities questionnaire which asked: "What type of recreational activities or hobbies does the applicant enjoy and spend time on?" Ms. Eyre responded that Claimant goes "to movies and down to Monterey for a break, or out with friends for dinner." However, a broader sample from Ms. Eyre's activities report provides the following description of Claimant's daily life:

"Some days she stays home in bed all day.... Some she can go run errands but she tires out easily ... some days she sleeps a lot.... She has gained a lot of weight and isn't as critical about the clothes she wears. Sometimes she doesn't care about how she looks. She was never this way before her illness.... [Sometimes she cooks meals], her daughter, stepson and husband all take turns.... Sue shops occasionally. She never goes alone.... She misses (Bible study) a lot because she has no energy even to just sit and listen.... She gets tired a lot. Real lethargic. She always comes to our house and ends up falling asleep.... [S]he finishes things but sometimes it takes a few days because she gets tired so easily."

3. Chronic fatigue syndrome is a disease that did not become widely known in the medical community until 1988 when the first diagnostic article was published. It was also in 1988 that the CDC accepted chronic fatigue syndrome as a disease. *Reed v. Secretary of Health & Human Services,* 804 F.Supp. 914, 916 (E.D.Mich.1992).

4. *See also Sabo v. Chater,* 955 F.Supp. 1456, 1463 (M.D.Fla.1996) (ruling that a reversal was required where the ALJ failed to apply standards appropriate to CFS); *Fragale v. Chater,* 916

F.Supp. 249, 254 (W.D.N.Y.1996)("CFS ... may produce symptoms which 'significantly impair [a] claimant's ability to perform even sedentary work ....'") (*quoting Rose v. Shalala,* 34 F.3d 13, 17 (1st Cir.1994)); *Williams v. Shalala,* 1995 WL 328487, at *6 (W.D.N.Y. May 19, 1995) (holding that a remand was required where the ALJ's decision "reflects an analysis inconsistent with the appropriate framework for assessing disability claims premised on CFS."); *Irwin v. Shalala,* 840 F.Supp. 751, 770 (D.Or.1993) (holding that a reversal was required where the ALJ discredited testimony of CFS claimant and doctors); *Powell v. Chater,* 959 F.Supp. 1238, 1245 (C.D.Cal.1997) (ruling that a remand was required where the ALJ's perceived inconsistencies in the record were "minimal at best.").

5. Dr. Ng commented, "[a]fter reviewing the medical records of Mrs. Reddick and performing the history and physical on February 4, 1992, I have to agree with Dr. Charney that she does meet the CDC criteria for the diagnosis of chronic fatigue syndrome." He also stated, "[i]ncidentally I think she should also be seen by a psychiatrist to see whether there is any underlying psychological disorder. However, this would not change the fact that she still is disabled, even if her symptomology is secondary to a psychiatric disorder."

6. Dorland's Medical Dictionary outlines some of the symptoms commonly associated with CFS. The dictionary defines chronic fatigue syndrome as a "persistent debilitating fatigue of recent onset, with reduction of physical activity to less than half of usual, accompanied by some combination of muscle weakness, sore throat, mild fever, tender lymph nodes, headaches, and de-

She also underwent years of testing and examination to rule out other possible illnesses. In addition, the record shows that Claimant periodically advised her doctors when she was feeling somewhat better. This is unlikely behavior for a person intent on overstating the severity of her ailments. We conclude that the ALJ provided unsatisfactory reasons for discounting Claimant's credibility, and that his findings were unsupported by substantial evidence based on the record as a whole.

### 2. *Residual Functional Capacity*

The ALJ also failed to take into account the debilitating effects of CFS when making his determination, at step four, that Claimant had the residual functional capacity to perform her past work. Although the ALJ found that "the medical evidence establishes that Claimant has chronic fatigue syndrome," the ALJ's evaluation of functional capacity ignored the key symptom of CFS, which is persistent fatigue.

Social Security regulations define residual functional capacity as the "maximum degree to which the individual retains the capacity for *sustained* performance of the physical-mental requirements of jobs." 20 C.F.R. 404, Subpt. P, App. 2 § 200.00(c) (emphasis added). In evaluating whether a claimant satisfies the disability criteria, the Commissioner must evaluate the claimant's "ability to work on a sustained basis." 20 C.F.R. § 404.1512(a); *Lester*, 81 F.3d at 833 (internal quotation marks omitted). The regulations further specify: "When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis." *Id.* at § 404.1545(b). This court has noted that "[o]ccasional symptom-free periods—and even the sporadic ability to work-are not inconsistent with disability." *Lester*, 81 F.3d at 833.

The ALJ's finding that Claimant could return to her past work as a payroll

clerk was premised, almost exclusively, on reports by two consulting examiners hired in 1993 in connection with Claimant's disability claim. Dr. Wood examined Claimant on a one-time basis and found "no muscle atrophy, normal reflexes, normal grip·strength, and a full range of motion of all extremities." He found "no limitations in sitting, standing, walking, hand movements, or fine finger movements," and estimated that she would be able to "lift, push, or pull up to 15 to 20 pounds without difficulty." Claimant's ability to perform light work was evaluated on the basis of these orthopedic factors only. Although Dr. Wood's report also included a diagnosis of "possible CFS" and a notation that Claimant manifested "extreme lethargy," the potential effects of fatigue on her functional capacity were not considered.

Dr. Moseley, a psychologist, administered a series of standard psychological tests and, finding that Claimant had no major social deficits, concluded that she could return to an "eight-hour workday routine and forty-hour work week." Dr. Moseley did not have Claimant's medical file, except for the brief report written by Dr. Wood two months prior. Neither doctor assessed Claimant's ability to perform sustained work.

Because the ALJ's evaluation of residual functional capacity failed to address claimant's ability to undertake sustained work activity, his analysis did not comport with the Social Security Administration's regulatory requirements. *See Cohen*, 964 F.2d at 529 ("Although her mental capacity perhaps would have been more than adequate, Cohen simply would have lacked the stamina for such employment."); *Rose*, 34 F.3d at 19 ("The question here is the extent to which claimant's fatigue in fact restricts his residual functional capacity."); *Williams v. Shalala*, 1995 WL 328487, at *6 (holding that, where the ALJ failed to consider claimant's non-exertional limitations, the "ALJ's decision, on the whole, reflect[ed] an analysis inconsistent with the appropriate framework for assessing disability claims premised on CFS."). The ALJ's finding on residual func-

---

pression, with the symptoms not attributable to any other known causes." *Dorland's Illustrated*

*Medical Dictionary* 1627 (28th ed.1994).

tional capacity was not supported by substantial evidence as it failed to account for the effects of fatigue on Claimant's ability to function in the workplace.

### 3. *Physicians' Opinions*

In finding that Claimant's CFS had not rendered her disabled, the ALJ rejected the opinions of Claimant's treating physician, Dr. Jacobson, and an insurance carrier's consulting examiner, Dr. Charney, and instead relied on the opinions of the two Social Security consulting examiners, Dr. Wood and Dr. Moseley. The ALJ failed to provide clear, convincing, specific or legitimate reasons for rejecting the opinion of Dr. Jacobson. The ALJ also provided no legitimate basis for rejecting the opinion of Dr. Charney, who was hired by Claimant's private insurance carrier to examine Claimant and who would have no incentive to overstate her limitations.

The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant. *Lester*, 81 F.3d at 830. Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. *Id.* (internal quotation marks omitted). Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record. *Id.* at 830, quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983). This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. *Magallanes*, 881 F.2d at 751. The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct. *Embrey v. Bowen*, 849 F.2d 418, 421–22 (9th Cir.1988).

In disability benefits cases such as this, physicians may render medical, clinical opinions, or they may render opinions on the ultimate issue of disability—the claimant's ability to perform work. As we stated in *Matthews v. Shalala*, 10 F.3d 678 (9th Cir. 1993), " '[t]he administrative law judge is not bound by the uncontroverted opinions of the claimant's physicians on the ultimate issue of disability, but he cannot reject them without presenting clear and convincing reasons for doing so.' " *Id.* at 680 (*quoting Montijo v. Secretary of Health & Human Servs.*, 729 F.2d 599, 601 (9th Cir.1984)). *See also Lester*, 81 F.3d at 830; *Embrey*, 849 F.2d at 422.[7] A treating physician's opinion on disability, even if controverted, can be rejected only with specific and legitimate reasons supported by substantial evidence in the record. *Lester*, 81 F.3d at 830. In sum, reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion.

In the present case, the ALJ, writing in the third person, provided the following rationale for rejecting the opinions of Dr. Jacobson and Dr. Charney:

> The consultative examinations of Drs. Wood and Moseley, which the Administrative Law Judge found to be objective, found the claimant capable of work. The Administrative Law Judge does not credit the assessments of Dr. Jacobson or Dr. Charney. These conflict with the more objective assessments in the consultative examinations of Drs. Moseley and Wood and are based on the subjective complaints of the claimant who was found not very credible.

We conclude that the ALJ's rejection of the opinions of Dr. Jacobson and Dr. Charney on the premise that they were based on the subjective complaints of the claimant is ill-suited to this CFS case. The

---

7. In *Embrey* we rejected the ALJ's conclusory statements rejecting the treating doctor's opinion on disability: "Here, the ALJ does not give sufficiently specific reasons for rejecting the conclusion of [Embrey's treating orthopedist] that Embrey is 'permanently disabled....' Nor does the ALJ explain why he disagrees with Dr. Baker's conclusion that Embrey is permanently unemployable.... Instead, he merely states that the objective factors point toward an adverse conclusion and makes no effort to relate any of these objective factors to any of the specific medical opinions and findings he rejects. This approach is inadequate." *Embrey*, 849 F.2d at 422.

ALJ's reasoning runs counter to the CDC's published framework for evaluating and diagnosing CFS. Chronic fatigue is defined as "*self-reported* persistent or relapsing fatigue lasting six or more consecutive months." Centers for Disease Control, The Chronic Fatigue Syndrome: A Comprehensive Approach to its Definition and Study, 121 *Annals of Internal Medicine* 954 (1994) (emphasis added). Although CFS is accompanied by symptoms such as body aches, low-grade fevers, memory problems, headaches, and extended flu-like symptoms, which Claimant manifested, the presence of persistent fatigue is necessarily self-reported. The final diagnosis is made "by exclusion," or ruling out other possible illnesses. Dr. Jacobson followed Claimant's progress for three and a half years, referred her to several specialists and conducted extensive lab testing to rule out other possible illnesses.

The ALJ decision cited a general comment made by Dr. Ng that because "it was the job of the treating physician to be compassionate and supportive of the patient," the treating physician would have no motivation to discount a patient's complaints of CFS symptoms. This skepticism of a treating physician's credibility flies in the face of clear circuit precedent. *See Lester*, 81 F.3d at 833 ("The treating physician's continuing relationship with the claimant makes him especially qualified to evaluate reports from examining doctors, to integrate the medical information they provide, and to form an overall conclusion as to functional capacities and limitations, as well as to prescribe or approve the overall course of treatment.").

The ALJ decision noted that Dr. Jacobson had written letters describing Claimant's condition in response to requests from Claimant's long-term disability carrier and her attorney. The Commissioner contends that Dr. Jacobson's credibility can be questioned because he had responded to such requests. Recent circuit opinions have discussed the relative evidentiary value of solicited opinion letters. Our opinions reveal that the mere fact that a medical report is provided at the request of counsel or, more broadly, the purpose for which an opinion is provided, is not a legitimate basis for evaluating the reliability of the report. Evidence of the circumstances under which the report was obtained and its consistency with other records, reports, or findings could, however, form a legitimate basis for evaluating the reliability of the report.

In *Burkhart v. Bowen*, 856 F.2d 1335 (9th Cir.1988), we rejected a doctor's opinion in a letter requested by counsel where the opinion was unsupported by medical findings, personal observations, or test reports. *Id.* at 1339–40. We noted in *Burkhart* that "given the evidence before the ALJ, [the fact that the letter had been solicited by counsel] was not the only reason the ALJ gave for rejecting (the doctor's) statements." *Id.* at 1339. However, In *Lester*, where there was no sound basis for rejecting a doctor's opinion that had been solicited by counsel, we stated that "the purpose for which medical reports are obtained does not provide a legitimate basis for rejecting them." 81 F.3d at 832. In *Saelee v. Chater*, 94 F.3d 520 (9th Cir. 1996), citing *Lester*, we rejected a doctor's opinion letter where "actual improprieties" had been found. *Id.* at 523. In *Saelee*, the doctor's opinion letter varied from his treatment notes and "was worded ambiguously in an apparent attempt to assist [the claimant] in obtaining social security benefits." *Id.* at 522. In that case, the ALJ found that there was "no objective medical basis for the opinion." *Id.* at 523.

We clarify here that, in the absence of other evidence to undermine the credibility of a medical report, the purpose for which the report was obtained does not provide a legitimate basis for rejecting it. In the present case, the fact that Dr. Jacobson drafted response letters should have no adverse affect on his credibility or the weight of his determination. Dr. Jacobson's letters were consistent with his findings spanning several years. His opinion was drawn from three and a half years of treatment and is supported by medical reports in the record. His clinical findings were not contradicted by any of the examining physicians.

We also conclude that the record provides no basis for the ALJ's finding that Social Security consulting examiners Wood and

Moseley were more objective than Drs. Charney or Jacobson. Dr. Charney, who agreed with the CFS diagnosis and found Claimant to be disabled, was hired by Claimant's disability carrier to evaluate her eligibility for long-term benefits. If any bias were to exist, it would have been expected to be against Claimant. In addition, there is nothing in the record to show a lack of objectivity in Dr. Jacobson, who treated Claimant for over three years. In contrast, Drs. Wood and Moseley examined Claimant on a one-time basis. In the absence of Claimant's key medical records, Dr. Moseley performed standard psychological tests, and from that limited information pronounced that "she may be expected to resume ... an eight-hour workday routine and 40–hour work week."

## IV.

### Evaluation as an Excess Pain Case

██ Claimant contends that the ALJ also erred by characterizing her case as an "excess pain" case, and applying Social Security Ruling (SSR) 88–13, which provides guidance for evaluating complaints of disabling pain. SSR 88–13, Soc. Sec. Rep. Ser. 652, 1988 WL 236011. Claimant did not allege excess pain as the basis for her claim,[8] yet the ALJ decision stated:

> The claimant has alleged pain which is neither evinced nor supported by the objective medical evidence in this record. Such excessive pain complaints will be considered in light of other indicia of credible pain beyond the objective medical evidence of record.

Citing to SSR 88–13, the ALJ noted:

In evaluating the claimant's allegation of 'disabling pain' in this instance, the ALJ has given consideration not only to the medical evidence of record, but also to the type, dosage, effectiveness, and side effects of any prescribed pain medication and to other treatment for pain symptoms. The claimant's daily activities and functional restrictions during the relevant period have been considered as well in evaluating the credibility of the claimant's alleged disabling pain complaints.

Although SSR 88–13 applies to the evaluation of pain "and other symptoms,"[9] the ALJ considered only *pain* and its effect on Claimant's activities and the potential relief by medication, rather than *fatigue* which is the basis of Claimant's disability claim. The ALJ's focus on pain medication and treatment is misplaced, as the CDC has made it clear that no definitive treatment for CFS exists.[10] But even more salient is the fact that the ALJ failed to consider the Program Operations Manual System ("POMS") guidelines on CFS issued by the Social Security Administration in 1993. The POMS policy states in pertinent part:

> Chronic Fatigue Syndrome (CFS), previously known as Chronic Epstein–Barr Virus Syndrome, and also currently called Chronic Fatigue and Immune Dysfunction Syndrome, is a systemic disorder consisting of a complex of variable signs and symptoms which may vary in duration and severity. The etiology and pathology of the disorder have not been established. Although there are no generally accepted criteria for the diagnosis of cases of CFS, an operational concept is used by the medical community. There is no specific treat-

**8.** In her April 5, 1993 application for disability benefits, Claimant referred to her "disabling condition." In the accompanying disability report filed on April 5, 1993 she lists her disability as "Chronic Immune Dysfunction" or "Chronic Fatigue Syndrome." The SSA's denial notice of her initial application dated September 27, 1993 notes that "you said that you were unable to work because of chronic fatigue syndrome." In Claimant's request for a hearing by an Administrative Law Judge dated March 3, 1994, she stated, "Due to chronic fatigue syndrome, I am totally disabled." Commissioner writes in its opening brief that "Claimant filed her applica-

tion for disability insurance benefits under Title II of the Act on April 5, 1993, alleging that she had been unable to work since October 4, 1989 due to chronic fatigue syndrome."

**9.** SSR 88–13, 1988 WL 236011; 20 C.F.R. §§ 404.1598, 404.1528–29, 416.908, 416.928–29.

**10.** Centers for Disease Control, "The Chronic Fatigue Syndrome: A Comprehensive Approach to its Definition and Study," 121 *Annals of Internal Medicine* 953 (1994). *See also*, "The Chronic Fatigue Syndrome," 90 *American Journal of Medicine* 730, 736 (June 1991).

ment, and manifestations of the syndrome are treated symptomatically.

CFS is characterized by the presence of persistent unexplained fatigue and by the chronicity of other symptoms. The most prevalent symptoms include episodes of low-grade fever, myalgias, headache, painful lymph nodes, and problems with memory and concentration. These symptoms fluctuate in frequency and severity and may be seen to continue over a period of many months. Physical examination may be within normal limits. Individual cases must be adjudicated on the basis of the totality of the evidence, including the clinical course from the onset of the illness, symptoms, signs, and laboratory findings. Consideration should be given to onset duration, severity and residual functional capacity following the sequential evaluation process.

POMS § DI 24575.005 (1993). The ALJ's failure to acknowledge the POMS guidelines may be emblematic of the reluctance to acknowledge CFS that appears to underlie his decision.

## V.

### Conclusion

For the reasons described herein, we hold that the ALJ's decision that Claimant is capable of performing full-time light work and returning to her past work as a payroll clerk is not supported by substantial evidence. After three and a half years of treatment and referral to a series of specialists, Claimant's treating physician found her to be disabled. An examining physician hired by Claimant's insurance carrier also determined that she was disabled. The ALJ's finding that Claimant was not disabled was premised almost exclusively on reports by two Social Security consultative examiners hired in connection with Claimant's Social Security disability claim. Dr. Wood's conclusion that Claimant was not disabled was based exclusively on an evaluation of orthopedic factors such as reflexes, grip strength, and ability to sit, stand and walk. Although Dr. Wood's report noted that Claimant manifested "extreme lethargy," the potential effects of fatigue on her functional capacity were not considered. Dr.

Moseley's examination was limited to psychological testing and her mental capacity to work, and did not consider Claimant's fatigue resulting from CFS. Neither doctor assessed Claimant's ability to perform work on a sustained basis in light of the fatigue caused by CFS. We conclude, therefore, that the evidence in the record does not support the discounting of the treating physician's conclusion that Claimant is disabled from future employment.

The final question for us to resolve is whether to remand for further proceedings or for an award of benefits. The decision whether to remand a case for additional evidence or simply to award benefits is within the discretion of the court. *Swenson v. Sullivan,* 876 F.2d 683, 689 (9th Cir.1989) (*citing Varney v. Secretary of HHS,* 859 F.2d 1396, 1399 (9th Cir., 1988) (*Varney II*)). In *Varney II,* we held that in cases where the record is fully developed, a remand for further proceedings is unnecessary:

> In cases where there are no outstanding issues that must be resolved before a proper disability determination can be made, and where it is clear from the administrative record that the ALJ would be required to award benefits if the claimant's excess pain testimony were credited, we will not remand solely to allow the ALJ to make specific findings regarding that testimony. Rather, we will ... take that testimony to be established as true.

*Varney II,* 859 F.2d at 1401. *See also Swenson,* 876 F.2d at 689 (directing an award of benefits where no useful purpose would be served by further proceedings); *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir.1989) (same); *Winans v. Bowen,* 853 F.2d 643, 647 (9th Cir.1987) (accepting uncontradicted testimony as true and awarding benefits where the ALJ failed to provide clear and convincing reasons for discounting the opinion of claimant's treating physician).

Here, the ALJ determined, at step four, that Claimant had the residual functional capacity to perform her past work as a payroll clerk. Had he reached step five, he would have been required to determine whether she was able to perform other work that exists in

significant numbers in the national economy. 20 C.F.R. § 404.1561.

■ In general, if a claimant suffers only from exertional limitations, e.g., strength limitations, the ALJ at step five may apply the Commissioner's Medical–Vocational Guidelines [the "grids"] to match the claimant with appropriate work. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(b). The grids are based on strength factors only. *Id.*[11] The ALJ may apply the grids in lieu of taking testimony of a vocational expert only when the grids accurately and completely describe the claimant's abilities and limitations. *Jones v. Heckler,* 760 F.2d 993, 998 (9th Cir.1985) (citation omitted). If the grids fail accurately to describe a claimant's limitations, the ALJ may not rely on the grids alone to show the availability of jobs for the claimant. *Id.* (citations omitted). *See also Bapp v. Bowen,* 802 F.2d 601, 605–06 (2d Cir.1986) (stating that application of the grids is inappropriate where a claimant's work capacity is significantly diminished beyond that caused by an exertional impairment). In these cases, the ALJ must also hear the testimony of a vocational expert. *Desrosiers v. Secretary of Health & Human Servs.* 846 F.2d 573, 578 (9th Cir.1988) (Pregerson, J., concurring) (citing *Perminter v. Heckler,* 765 F.2d 870, 872 (9th Cir.1985)).[12]

■ We do not remand this case for further proceedings because it is clear from the administrative record that Claimant is entitled to benefits. Because limitations caused by CFS include non-exertional limitations, the Commissioner cannot, at step five, rely exclusively on the grids. Testimony of a vocational expert is required.

At Claimant's hearing before the ALJ, a vocational expert did testify about the nature of Claimant's limitations. The expert testified that if Claimant's testimony were credited concerning her fatigue, she would be unable to perform her past work, due to her need to take frequent naps and an inability to carry out repetitive tasks. *See Kornock v. Harris,* 648 F.2d 525, 527 (9th Cir.1980) (citations omitted) ("The ability to work only a few hours at day or to work only on an intermittent basis is not the ability to engage in 'substantial gainful activity.' "). The vocational expert also testified that if Claimant were to require just one day per week of rest, she would be unable to perform her past work or any other work.[13]

Clamant's past work as a payroll clerk is classified as sedentary work, which is the lowest classification under the regulations. 20 C.F.R. § 404.1565. In *Sisco,* which involved similar facts, the Tenth Circuit determined that "[b]ecause sedentary work is the lowest classification under the statute, there is no need for further proceedings in this

**11.** The Medical–Vocational Guidelines indicate that they are based on strength factors and may not be appropriate in cases involving non-exertional limitations:

Since the rules are predicated on an individual's having an impairment which manifests itself by limitations in meeting the strength requirements of jobs, they may not be fully applicable where the nature of an individual's impairment does not result in such limitations....

20 C.F.R. Pt. 404, Subpt. P, App 2 § 200.00(e). *See also* 20 C.F.R. § 404.–1569(a) (defining non-exertional limitations as limitations that do not directly affect a claimant's [muscular] strength).

**12.** In *Periminter,* we held that pain is a non-exertional limitation. We also determined that, absent other reliable evidence that the claimant could perform specific jobs, a vocational expert was necessary. 765 F.2d at 872.

**13.** The relevant section of the transcript reads as follows:

ALJ: If I were to credit the claimant's testimony concerning her fatigue and pain, would the claimant be able to perform her past relevant work?
Vocational Expert: No, she would not.
ALJ: Why is that?
Vocational Expert: Because of the need to take frequent naps during the day. Some days unable to get out of bed to get to work. Performing repetitive tasks, such as using a computer, would probably increase the fatigue that is being described.
ALJ: Okay [Claimant's attorney], any questions of the Vocational Expert?
Claimant's Attorney: Just one. If she was limited to her bed even one day a week, only one day a week, would your answer still be the same about her inability to perform her past relevant work or any other work?
Vocational Expert: Yes.
Claimant's Attorney:. Okay, I have nothing further.

matter other than a remand for an award of benefits." 10 F.3d at 745–46.

We conclude that a remand for further proceedings would serve no useful purpose. We reverse the judgment of the district court and remand with instructions to remand to the ALJ for an award of benefits.

REVERSED AND REMANDED.