**James D. LESMEISTER, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of the Social Security Administration, Defendant.**

**No. EDCV 04–1345 RC.**

United States District Court,
C.D. California.

June 1, 2006.

Bill LaTour, attorney-at-law, Loma Linda, CA, for The plaintiff.

Sharla Cerra, Assistant United States Attorney, Los Angeles, CA, for The defendant.

## OPINION AND ORDER

CHAPMAN, United States Magistrate Judge.

Plaintiff James D. Lesmeister filed a complaint on October 15, 2004, seeking review of the Commissioner's decision denying his application for disability benefits. The Commissioner answered the complaint on April 11, 2005, and the parties filed a joint stipulation on May 17, 2005.

## BACKGROUND

### I

On January 31, 2000, plaintiff applied for disability benefits under Title II of the

Social Security Act ("the Act"), 42 U.S.C. § 423, and under the Supplemental Security Income ("SSI") program of Title XVI of the Act, 42 U.S.C. § 1382(a), claiming an inability to work since February 10, 1989, due to "panic attacks of terrorism, anguish, fear and security." Certified Administrative Record ("A.R.") 14, 59–61, 73. The plaintiff's applications were initially denied on May 1, 2000. A.R. 46–49. Plaintiff was subsequently found to be disabled for SSI purposes as of January 1, 2000, and awarded SSI disability benefits; however, plaintiff's Title II application was again denied on January 4, 2001, following reconsideration. A.R. 14, 28–29, 46–51, 54–57. Plaintiff requested an administrative hearing regarding his Title II application, which was held before Administrative Law Judge William B. Churchill ("ALJ Churchill") on January 28, 2002. A.R. 26–42, 58. On February 6, 2002, ALJ Churchill issued a decision finding plaintiff is not entitled to Title II disability benefits since he was not disabled prior to December 31, 1994. A.R. 10–16. Plaintiff appealed the decision to the Appeals Council, which denied review on July 3, 2002. A.R. 5–9.

 The plaintiff then filed a civil complaint challenging the Commissioner's decision, *Lesmeister v. Barnhart*, case no. EDCV 02–0880–RC ("Lesmeister I"),[1] which resulted in Judgment being entered on June 30, 2003, remanding the matter to the Social Security Administration ("SSA") due to ALJ Churchill's failure to call a medical expert pursuant to Social Security Ruling ("SSR") 83–20 [2] to assist him in determining the onset date of plaintiff's mental impairments.

On July 14, 2004, following remand, a second administrative hearing was held before Administrative Law Judge F. Keith Varni ("the ALJ"), who consolidated a new Title II application filed in 2003 with the previous application. A.R. 817, 821–40. On July 28, 2004, the ALJ issued a decision incorporating and supplementing the prior decision by ALJ Churchill, and finding plaintiff is not disabled. A.R. 813–19. The plaintiff challenges this decision.

**II**

The plaintiff, who was born on November 9, 1955, is currently 50 years old. A.R. 59, 824. This Court previously found plaintiff "is a college graduate, and has previously worked as an electrical engineer. [¶] Plaintiff's last insured date for Title II purposes is December 31, 1994." Lesmeister I at 2 (citations omitted).

Further, this Court made the following findings in Lesmeister I regarding plaintiff's medical treatment:

> On May 3, 2000, Barbara Wettstein, Ph. D., plaintiff's treating psychologist at the Veterans [Administration] Hospital [ ("VA") ], diagnosed plaintiff as having a delusional disorder, persecutory type, a panic disorder without agoraphobia, and alcohol dependence in full sustained remission, and found plaintiff's Global Assessment of Functioning [ ("GAF") ] was 45.[fn3] Furthermore, Dr. Wettstein noted:

---

**1.** Pursuant to Fed.R.Evid. 201, this Court takes judicial notice of all documents in Lesmeister I.

**2.** Social Security Rulings constitute the Social Security Administration's interpretations of the statute it administers and its own regulations. *Chavez v. Dep't of Health & Human Servs.*, 103 F.3d 849, 851 (9th Cir.1996). Although Social Security Rulings do not have the force of law, *Chavez*, 103 F.3d at 851, once published, they are binding upon the ALJs and the Commissioner. *Holohan v. Massanari*, 246 F.3d 1195, 1202–03 n. 1 (9th Cir.2001); *Gatliff v. Comm'r of Soc. Sec. Admin.*, 172 F.3d 690, 692 n. 2 (9th Cir.1999).

"The [plaintiff] reports an incident in February, 1989 where his home was raided and he was detained by law enforcement. Following this event, the [plaintiff] began to complain of intrusive obsessional thoughts related to future assaults by [the] governmental system, as well as panic attacks and anxiety symptoms. These symptoms have created a sense of paranoia in the [plaintiff] that has become generalized in multiple sources and systems."

[fn3] A GAF of 41–45 means that the plaintiff exhibits "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. (Text Revision) 2000).

Dr. Wettstein also noted plaintiff "has been unable to work since the incident, which occurred in 1989 . . . [and his] inability to work is due to his mistrust of governmental systems." Furthermore, Dr. Wettstein found:

"The [plaintiff] experiences persecutory delusions regarding his history with and current vulnerability to law enforcement. The [plaintiff] is highly suspicious and paranoid of governmental agencies and has emotionally isolated and withdrawn in an effort to protect himself. The [plaintiff] describes that the police are watching him at all times, sending people to his home to set him up, and that the police are waiting for him to demonstrate his vulnerability so that they can frame and terrorize him. When discussing his thoughts, the [plaintiff] will often demonstrate loose associations between the events and other disconnected occurrences."[fn5]

[fn5] As an example of the effect plaintiff's paranoia has on his daily activities, Dr. Wettstein noted "[t]he [plaintiff] reports that after the home raid in 1989, there have been various rooms in his home that have remained untouched. He reports that these rooms have not been cleaned or attended to for a number of years, due to the propensity that he will again be victimized or begin reliving those traumatic events."

Dr. Wettstein concluded:

"The [plaintiff] was given the Personality Assessment Inventory on [April 5, 2000]. Test results suggest that the [plaintiff] has significant clinical elevations on the cognitive and traumatic stress subcomponents of the anxiety scale. These findings appear to substantiate the presence of intrusive thoughts that [plaintiff] experiences in relation to the reported event that occurred in 1989. The test results further indicate that [plaintiff] experiences a great deal of social isolation, negative relationships, and is currently under a substantial amount of stress, all [of] which support the [plaintiff's] self-report, as well as his clinical presentation. Moreover, the test results suggest that [plaintiff] experiences a high level of paranoid ideation that is persecutory in nature, which exceeds the level found in most clinical samples."

Lesmeister I at 8–11 (citations and some footnotes omitted).

This Court further found in Lesmeister I:

[N]umerous Veterans Hospital treatment notes reference that plaintiff's mental problems stem from his experiences in 1989. For instance, on October 19, 2000, Balsam S. Khehra, M.D., a

staff physician, found plaintiff has experienced "[post-traumatic stress disorder] like symptoms after wrongful arrest 10 years ago...." Similarly, on December 1, 2000, Dr. Wettstein stated plaintiff has "persecutory delusions related to legal problems of approximately 10 years ago." [¶] Moreover, on March 28, 2000, Andrew J. Rooks, M.D., a consulting psychiatrist, diagnosed plaintiff as having panic disorder with agoraphobia, possible psychotic disorder and possible bipolar disorder, and found he had a GAF of 55–60,[fn6] if not psychotic, and of 40–45, if psychotic.[fn7] A.R. 543–51. Dr. Rooks succinctly set forth plaintiff's recitation of what happened in 1989 and its effects on him:

> "[Plaintiff] alleges that he had been in good mental health until unfortunate circumstances occurred in 1988, while he was employed in his field of electrical engineering. At that time, he states he had rented a room of his house to a welfare person, who allegedly sold drugs from his house, therefore the house was raided after drug informants made purchases while he was working. His house was raided while he was at a neighbor's house, but the authorities came to the neighbor's house, arrested, cuffed[ ] him, and allegedly put a gun in the back of his neck. He states that he was interrogated about the drugs at his house, and denied any knowledge of it, but was threatened further with a gun. He therefore feared for his life. He was jailed for 10 days, during which time his life was threatened by inmates day after day. No phone calls were allowed, and he witnessed two episodes of assault and sodomy in the jail, and felt his life would be over. Therefore he phoned a friend. Now he has recurrent thoughts and painful overwhelming feelings associated with those events. The thoughts keep coming up, as does the sodomizing, both while he is awake and asleep. He awakens in anger, rage, and fear [for] his life. Though he allegedly evicted the tenant, it was alleged that a murder had happened at his house on 03–20–89. He is exceedingly vague about this, and therefore I wonder whether such events actually took place, or whether it is a fantasy/delusion on his part. He states the event allegedly occurred while he was taking his female ex-roommate back to her parents' house. He claims he was told nothing about the alleged murder, but was accused of being involved in it. He doesn't know where the person was found. He states the investigation went on for years and years, and six months later, while his parents were there from Michigan, his house was raided again. [Plaintiff's] father was handcuffed and allegedly threatened with a gun, all of which caused more nightmares. His father posted bail for [plaintiff]. Since then, [plaintiff] has noted that he cannot concentrate, he felt his rights were violated, he feels vulnerable, and he feels the police set up the drug deals, and were involved in the murder.... He has nightmares almost daily since 02–23–88, when the raids occurred, or 03–20–99, when the murder occurred."

> [fn6] A GAF of 55–60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders,* 34 (4th ed. (Text Revision) 2000).

[fn7] A GAF of 40 indicates "[s]ome impairment in reality testing or communication" (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. (Text Revision) 2000).

Lesmeister I at 11–13 (citations omitted).

In February 2000, plaintiff began individual psychotherapy, A.R. 557, and he has been seeing a psychiatrist for medication since October 2000. *See, e.g.,* A.R. 120, 317, 350, 609, 727, 882, 1096. In addition to treatment at the V.A., plaintiff has also been receiving mental health treatment since March 2002, at the Riverside County Department of Mental Health. A.R. 880–87, 917–54.

## DISCUSSION

### III

The Court, pursuant to 42 U.S.C. § 405(g), has the authority to review the Commissioner's decision denying plaintiff disability benefits to determine if her findings are supported by substantial evidence and whether the Commissioner used the proper legal standards in reaching her decision. *Burch v. Barnhart,* 400 F.3d 676,

679 (9th Cir.2005); *Meanel v. Apfel,* 172 F.3d 1111, 1113 (9th Cir.1999).[3]

The claimant is "disabled" for the purpose of receiving benefits under the Act if he is unable to engage in any substantial gainful activity due to an impairment which has lasted, or is expected to last, for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). "The claimant bears the burden of establishing a prima facie case of disability." *Roberts v. Shalala,* 66 F.3d 179, 182 (9th Cir.1995), *cert. denied,* 517 U.S. 1122, 116 S.Ct. 1356, 134 L.Ed.2d 524 (1996); *Smolen v. Chater,* 80 F.3d 1273, 1289 (9th Cir.1996).

 When a Title II claimant's period of eligibility for disability benefits expires on a specific date, as here, it is the claimant's burden to prove he was either permanently disabled or subject to a condition that became so severe as to disable him prior to that date. *Armstrong v. Comm'r of the Soc. Sec. Admin.,* 160 F.3d 587, 589 (9th Cir.1998); *Macri v. Chater,* 93 F.3d 540, 543 (9th Cir.1996). Thus, as this Court held in Lesmeister I, "the critical date is the date of onset of disability, not the date of diagnosis." *Swanson v. Sec'y of Health & Human Servs.,* 763 F.2d 1061, 1065 (9th Cir.1985); *Morgan v. Sullivan,* 945 F.2d 1079, 1081 (9th Cir.1991) (per curiam).

 In Lesmeister I, this Court remanded plaintiff's application for Title II benefits to the SSA to obtain medical expert testimony in accordance with SSR 83–20.[4] Yet, following remand, the medical

---

**3.** Here, the ALJ, applying the five-step sequential evaluation process, found plaintiff has not engaged in substantial gainful activity since the alleged onset of disability. (Step One). The ALJ then found plaintiff is not disabled for Title II purposes since he did not have a "severe" mental impairment on or before December 31, 1994. (Step Two). The

ALJ did not go beyond Step Two. Plaintiff contends the ALJ erred in failing to discuss the report dated May 3, 2000, by Barbara Wettstein, Ph.D., which "clearly indicates that the Plaintiff has had significant problems since 1989." Jt. Stip. 3:5–4:15.

**4.** SSR 83–20 provides in pertinent part that:

expert who offered an opinion regarding plaintiff's onset date, William J.L. Cable, M.D., was not provided by SSA with plaintiff's full medical record—or any medical evidence; rather, he was given only Exhibit 11F, A.R. 1131, which ALJ Churchill appropriately described as "a summary that [plaintiff] compiled listing the changes in his life as a party of the Feb. 1989 incident." A.R. 15; *see also* A.R. 682–89.[5]

So much for compliance with this Court's previous Order of remand. The medical advisor who was to assist the Commissioner in determining plaintiff's onset date of disability was never provided with plaintiff's medical records! In light of the hundreds of pages of plaintiff's medical records, this failing cannot have been due to mere inadvertence; rather, it shows a callous disregard for this Court's Order of remand. In fact, Dr. Cable himself doubted he had plaintiff's entire medical record, stating "[t]here may be other medical exhibits but these were not provided[,]" before opining Exhibit "11F is *insufficient medical information* to clearly establish a medically definable illness prior to Dec. 1994." A.R. 1131 (emphasis in original). Despite Dr. Cable's statements, the ALJ then went on to "rely

upon" Dr. Cable's opinion, making absolutely no effort to correct the oversight, as he should have. *See* A.R. 818; *Tonapetyan v. Halter*, 242 F.3d 1144, 1150–51 (9th Cir.2001).

Without any medical evidence to review, Dr. Cable's "opinion" does not provide substantial evidence to support the ALJ's decision. *See, e.g., DeLorme v. Sullivan*, 924 F.2d 841, 848 (9th Cir.1991) (SSR 83–20 "sets forth guidelines for determining the date of onset of a disability and requires that all relevant medical records be obtained for determining onset date"); SSR 83–20, 1983 WL 31249, *2–3 (S.S.A.) ("Medical reports containing descriptions of examinations or treatment of the individual are basic to the determination of the onset of disability. The medical evidence serves as the primary element in the onset determination. Reports from all medical sources (e.g., physicians, hospitals, and government agencies) which bear upon the onset date should be obtained to assist in determining when the impairment(s) became disabling[,]" and the medical advisor who is required to infer onset date must consider these reports in addressing an onset date). "Because the ALJ's onset date determination was made without a

---

In some cases, it may be possible, based on the **medical** evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. **How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case.** This judgment, however, must have a legitimate **medical** basis. **At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.** If there is information in the file indicating that additional **medical** evidence concerning onset is available, such evidence should be secured before inferences are made.

SSR 83–20, 1983 WL 31249, *3 (S.S.A.) (emphasis added).

**5.** Dr. Cable himself erroneously described Exhibit 11F as "a summary by B. Host and B. Wettstein, Ph.D., prepared in May to December, 2000, of the 7 major stressors the claimant experienced in February 1998[sic]. A variety of psychiatric diagnoses or symptoms are noted in their records including PSTD [sic], panic attack, anxiety, delusion, schizophrenia, persecutory, and agoraphobia." (A.R. 1131). Apart from Exhibit 11F not being a medical record, "B. HOST" is not a health care professional, but an abbreviation for the V.A.'s Behavioral Health Outpatient Services clinic. *See* A.R. 557.

'legitimate medical basis,' it cannot stand." *Morgan,* 945 F.2d at 1083; *Armstrong,* 160 F.3d at 590–91; *Speight v. Apfel,* 108 F.Supp.2d 1087, 1092 (C.D.Cal.2000).

■■■ Further, the medical opinions of treating physicians are entitled to special weight, *Reddick v. Chater,* 157 F.3d 715, 725 (9th Cir.1998); *Embrey v. Bowen,* 849 F.2d 418, 421 (9th Cir.1988), because the treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Sprague v. Bowen,* 812 F.2d 1226, 1230 (9th Cir.1987); *Edlund v. Massanari,* 253 F.3d 1152, 1157 (9th Cir.2001); *see also* 20 C.F.R. § 404.1527(d)(2) (generally providing more weight is given to treating sources "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) ....”). Therefore, the ALJ must provide clear and convincing reasons for rejecting the uncontroverted opinion of a treating physician, *Connett v. Barnhart,* 340 F.3d 871, 874 (9th Cir.2003). "[E]ven if [a] treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Reddick,* 157 F.3d at 725; *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir.2005).

■■ Here, the ALJ rejected Dr. Wettstein's "opinions and comments" as "irrelevant since she first saw [plaintiff] on February 9, 2000, and has no knowledge either first hand or from medical records/reports as to what [plaintiff's] condition might have been at the date last insured." A.R. 818. The Commissioner argues that is a proper basis for the ALJ to reject Dr. Wettstein's retrospective opinions. Jt. Stip. at 5:23–6:3. However, the Commissioner is mistaken. The ALJ's proffered basis is legally wrong since it flies in the face of well-established law.[6] *See,* e.g., *Morgan v. Commissioner of the Soc. Sec. Admin.,* 169 F.3d 595, 601 (9th Cir.1999) ("[T]he circumstance of a retroactive diagnosis, standing alone, may not be sufficient to discount the opinion of a treating physician."); *Lester v. Chater,* 81 F.3d 821, 832 (9th Cir.1995) (" '[M]edical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the preexpiration condition.' " (citation omitted)); *Flaten v. Secretary of Health & Human Servs.,* 44 F.3d 1453, 1461 & n. 5 (9th Cir.1995) ("Retrospective diagnoses by treating physicians and medical experts ... are ... relevant to the determination of a continuously existing disability with onset prior to expiration of insured status."); *Smith v. Bowen,* 849 F.2d 1222, 1225 (9th Cir.1988) ("[M]edical reports are inevitably rendered retrospectively and should not be disregarded solely on that basis.").[7] In fact, the Commissioner herself acknowledges an ALJ should consider retrospective medical opinions. *See* Jt. Stip. at 5:10–13 ("[R]etrospective medical opinions may be relevant to assessing a claimant's condition prior to expi-

---

6. Nor should this result surprise the Commissioner since the Court made exactly the same point in Lesmeister I. *See* Lesmeister I at 8 n. 2.

7. The Commissioner also asserts the ALJ properly rejected Dr. Wettstein's opinions since "neither Dr. Wettstein nor Plaintiff has identified any contemporaneous objective evidence to support Dr. Wettstein's retrospective opinions." Jt. Stip. at 6:3–4. However, the ALJ did not rely on this rationale to reject Dr. Wettstein's opinions, and this Court "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision." *Pinto v. Massanari,* 249 F.3d 840, 847 (9th Cir.2001); *see also Connett,* 340 F.3d at 874 (court erred in affirming ALJ's credibility determination based on court's independent findings).

ration of [his] insured status" (citing *Flaten*, 44 F.3d at 1461 n. 5)).

■ Where the ALJ fails to provide adequate reasons for rejecting the opinions of a treating physician, as here, the Court must "credit that opinion 'as a matter of law.'" *Lester*, 81 F.3d at 834 (citations omitted); *Edlund*, 253 F.3d at 1160. Thus, the Court adopts Dr. Wettstein's opinions that plaintiff's mental impairment commenced shortly after his home was raided in February 1989, and plaintiff "has been unable to work since ... 1989." A.R. 556–63.

## IV

When the Commissioner's decision is not supported by substantial evidence, the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir.2002). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir.2004); *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir.), *cert. denied*, 531 U.S. 1038, 121 S.Ct. 628, 148 L.Ed.2d 537 (2000). "Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits." *Benecke*, 379 F.3d at 593; *McCartey*, 298 F.3d at 1076–77.

■ Here, this Court finds that the record has been fully developed and "remand for further administrative proceedings [would] serve[ ] no useful purpose and is unwarranted." *Benecke*, 379 F.3d at 596; *Moisa v. Barnhart*, 367 F.3d 882, 887 (9th Cir.2004). Indeed, this Court previously remanded this matter to afford the Commissioner an opportunity to address the onset date issue, but following remand, the ALJ failed to meaningfully comply with the Court's Order. *Giampaoli v. Califano*, 628 F.2d 1190, 1196 (9th Cir.1980); *see also Filocomo v. Chater*, 944 F.Supp. 165, 171 (E.D.N.Y.1996) (finding when matter had previously been remanded to SSA, which failed to follow directives, reversal and not another remand was appropriate remedy). Under such circumstances, "[a]llowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication." *Benecke*, 379 F.3d at 595; *see also Moisa*, 367 F.3d at 887 ("The Commissioner, having lost this appeal, should not have another opportunity to show that [plaintiff] is not credible any more than [plaintiff], had he lost, should have an opportunity for remand and further proceedings to establish his credibility."). Furthermore, "[r]emanding a disability claim for further proceedings can delay much needed income for claimants who are unable to work and are entitled to benefits, often subjecting them to 'tremendous financial difficulties while awaiting the outcome of their appeals and proceedings on remand.'" *Benecke*, 379 F.3d at 595 (quoting *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1398 (9th Cir. 1988)). Thus, an award of benefits is appropriate, here.

## ORDER

IT IS ORDERED that: (1) plaintiff's request for relief is granted and the defendant's request for relief is denied; and (2) the Commissioner shall award plaintiff disability benefits under Title II of the Social Security Act, 42 U.S.C. § 423, using an onset disability date of February 10, 1989, and Judgment shall be entered accordingly.

## JUDGMENT

IT IS ADJUDGED that Judgment be entered in favor of plaintiff, and the Commissioner shall award disability benefits to plaintiff under Title II of the Social Security Act, 42 U.S.C. § 423, using an onset date of February 10, 1989.