**Joyce VICK, Plaintiff,**

v.

**COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, Defendant.**

**No. CIV. 98–1196–JO.**

United States District Court, D. Oregon.

July 2, 1999.

David B. Lowry, Tim D. Wilborn, Tim Wilborn, Portland, OR, for Plaintiff.

William W. Youngman, Assistant United States Attorney, District of Oregon, United States Attorney's Office, Portland, OR Lucille G. Meis, Social Security Administration, Office of General Counsel, Seattle, WA, for Defendant.

ROBERT E. JONES, District Judge.

Claimant Joyce Vick seeks judicial review of a final decision of the Commissioner of Social Security denying her claim for Social Security disability insurance benefits ("DIB"). This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Following a careful review of the record, I affirm that decision.

## ADMINISTRATIVE HISTORY

Claimant filed an application for DIB on January 20, 1995. (Tr. 81–83.) The application was denied both initially (Tr. 86–89) and upon reconsideration (Tr. 92–98). Claimant then untimely requested a hearing, which was denied April 12, 1996 by an Administrative Law Judge ("ALJ") for lack of good cause to extend the time for filing. (Tr. 20, 193–96.) On April 18, 1996, claimant appealed the decision denying the extension (Tr. 197); on May 21, 1997, the Appeals Council found that claimant had good reason for not filing timely and remanded for a de novo hearing before an ALJ (Tr. 208–10), which was held August 6, 1997 (Tr. 31, 41).

The ALJ denied claimant benefits in an August 25, 1997 decision, finding that she was not disabled. (Tr. 20–30.) The Appeals Council denied claimant's request for review of the ALJ's decision on September 16, 1998. (Tr. 3–4.) As a result, the ALJ's decision became the agency's final order.

## STANDARD OF REVIEW

This court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence on the record as a whole. *Tylitzki v. Shalala,* 999 F.2d 1411, 1413 (9th Cir.1993). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Maggard v. Apfel,* 167 F.3d 376, 379 (7th Cir.1999) (citing *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). The court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusion." *Martinez v. Heckler,* 807 F.2d 771, 772 (9th Cir.1986). The Commissioner's decision must be upheld if it is a rational interpretation of the evidence, even if there are other possible rational interpretations. *Magallanes v. Bowen,* 881 F.2d 747, 750 (9th Cir.1989).

## SUMMARY OF ALJ'S FINDINGS

The ALJ utilized a five-step "sequential evaluation" process in evaluating claimant's disability, as required. *See* 20 C.F.R. § 416.920. The ALJ first determined that claimant satisfied the disability insurance requirements from June 15, 1991 through December 31, 1993, during which time she attained sufficient coverage. The ALJ also found that claimant has not engaged in substantial gainful activity since June 15, 1991. (Tr. 21, 29.) Next, the ALJ determined that as of December 13, 1993, claimant's date last insured, claimant had no impairments that were severe. (Tr. 26, 27, 29.) In finding thus, the ALJ determined claimant's statements regarding her impairments to be not entirely credible. In particular, the ALJ found contradictions in reviewing claimant's earnings,

which rose as high as $500.00 per month (thus remaining below the level of substantial gainful activity) during the period in question, and her declared inability to work; her capacity to bowl, shop, and vacation; and the reports of her treating practitioners. (Tr. 28, 29.)

The ALJ further determined that claimant did not have any impairments which significantly limited her capacity to perform basic work-related functions. The ALJ found support for this finding in claimant's work as a babysitter. (Tr. 29.) As a result, the ALJ found claimant not to be disabled, as defined in the Social Security Act, through December 31, 1993. The ALJ accordingly denied claimant's request for DIB.

## STATEMENT OF FACTS

Born December 2, 1940, claimant was 56 years old at the time of the ALJ decision. She has a high school diploma and completed a business accounting course in night school, which she never used. Claimant worked at K–Mart from October 1968 to August 1986 in a variety of positions including 16 years as a receiving clerk. In 1990 and 1991,[1] claimant was a counter person in a retail dry cleaner. In 1991, claimant worked for two weeks at a Target store, though she left that position to take advantage of a trip to Las Vegas that she had won. (Tr. 163.) She also worked for three months at Mailbox Etc., possibly in 1992.[2] (Tr. 163.) Claimant was a baby sitter from 1991 to 1993[3] (Tr. 64, 67), working full-time three to five days per week for $20.00 or $25.00 per day (resulting in gross wages of $240 to $500 per month).

Claimant alleges disability based on combined impairments of obesity, knee injuries, irritable bowel syndrome, and a shoulder injury. Because claimant's date last insured for DIB is December 31, 1993 (Tr. 21), she must show that her disability commenced on or before that date.

## Medical Evidence

On May 1, 1990, claimant had arthroscopic surgery on her right knee. (Tr. 175.) By May 29, 1990, Dr. Coletti noted that claimant was "[d]oing extremely well" and by June 26, 1990, Dr. Coletti reported that claimant's knee "looks fine," following a fall two weeks previous. (Tr. 190.) Claimant's knee later began bothering her again beginning May 31, 1994 after she injured her knee while deplaning. (Tr. 146.) In 1994, claimant repeated the arthroscopic knee surgery. (Tr. 175.) In 1996, claimant underwent a total knee replacement. (Tr. 175.)

Claimant strained her left ankle as the result of a motor vehicle accident on August 31, 1992 (Tr. 156), for which she received a short leg walking cast prescribed by Dr. Peterson on September 11, 1992. (Tr. 189.) Her ankle bothered her until February 2, 1993, when she had good range of motion and no localized tenderness, though she was not "as vigorous as she could be in pursuing her home exercises." (Tr. 187.)

Claimant experienced tenderness in her left shoulder by July 27, 1992, resulting in muscle spasms and a decreased range of motion, which was described as tendinitis/bursitis by Dr. Pausig then (Tr. 157) and on August 3, 1992 as "classic presenta-

1. The record contains conflicting evidence with respect to the dates of claimant's employment at the dry cleaner: She either worked there in 1989 and 1990 (Tr. 51, 163) or in 1990 and 1991 (Tr. 21).

2. The timing of claimant's work at Mailboxes Etc. is unclear. The psychologist to whom she reported this employment indicates uncertainty at the timing ("(1992?)"); claimant also reports that she was not employed after her work at Mailboxes Etc. (Tr. 163). (She did, however, babysit for her grandchildren in 1993. (Tr. 64, 67.))

3. Claimant states at one point that she commenced her work as a baby sitter in 1990. (Tr. 52.) However, she later determined that she began this work in 1991; this was corroborated by her daughter, for whom claimant babysat. (Tr.64, 67.)

tion" of tendinitis of the left shoulder. (Tr. 156.) Claimant complained to Dr. Peterson of left shoulder pain November 4, 1992, although she had full range of motion and "no appreciable acromioclavicular tenderness." (Tr. 188) Dr. Peterson gave claimant an injection, and she felt better by November 9, 1992. (Tr. 188.) However, on April 7, 1993, Dr. Pausig noted bursitis of the left shoulder, which he suspected might have been caused by bowling the previous night. (Tr. 153.) The bursitis extended to claimant's left neck by April 12, 1993. (Tr. 152.) On April 16, 1993, Dr. Pausig recommended that claimant refrain from babysitting for a week. (Tr. 152.)

Claimant experienced what Dr. Pausig thought to be peptic acid disease July 6, 1992. (Tr. 157.) The peptic acid disease was "under fairly stable control," with flare-ups, by January 12, 1994. (Tr. 149.) Rectal bleeding, with "intermittent constipation and diarrhea" caused suspicion of hemorrhoids, polyps, or a fissure February 1, 1993.[4] (Tr. 153.) What is described in the medical records as "irritable bowel syndrome" ("IBS") was under "reasonable control" by January 12, 1994, with no underlying pathology suspected.[5] (Tr. 149.)

In November 1992, Dr. Pausig suspected fibrositis was responsible for "generalized inflammation in various parts of her body." (Tr. 154.) He repeated this suspicion on February 1, 1993, when arthritis apparently was ruled out due to negative tests in the past. (Tr. 153.) On April 23, 1993, claimant's inflammation was "doing well" (Tr. 151), and on July 29, 1993 Dr. Pausig noted no "sciatic notch tenderness"[6] (Tr. 151).

Dr. Pausig diagnosed claimant with lower back strain on July 29, 1993 (Tr. 151) and again on August 9, 1993, as a result of "moving some things around her house" (Tr. 150, 151). September 3, 1993, although she "[got] better" and was "making slow progress" on DayPro, claimant aggravated her lower back strain by spending a day "walking around the fair." (Tr. 150.)

Claimant also complains of obesity. While the record does not contain a history of treatment for obesity, it does contain several references to claimant's size. The only such reference within the relevant time frame is on August 9, 1993. (Tr. 150.) Dr. Pausig noted, with respect to claimant's "low back strain," that "[h]er weight is certainly contributory with the length of time this is taking to clear it up." (Tr. 150.) In 1990, Dr. Coletti noted several times that claimant is a large woman. (Tr. 190, 191.) On April 1, 1994, Dr. Pausig noted that claimant's abdomen was "soft, obese." (Tr. 147.)

**Hearing Testimony**

Claimant testified at the hearing. (Tr. 41–65.) Claimant's daughter, Janice Wallace, and claimant's husband, Tommy Vick, also testified at the hearing. (Tr. 65–80.)

Claimant testified that she had trouble walking in 1993, walking only two blocks before stopping to rest for five to ten minutes. (Tr. 44.) The first knee surgery (in 1990) alleviated her pain better than the second (in 1994), with claimant characterizing her progress after the surgery as "fairly well." (Tr. 45.) By 1993, however, claimant began feeling pain in her knee again. (Tr. 45.) Due primarily to knee pain, in 1993, claimant had difficulty kneeling, pushing, pulling, crouching, and bend-

---

**4.** Treatment of the hemorrhoids appears to have commenced May 12, 1995. (Tr. 139.)

**5.** Claimant continued to complain occasionally of abdominal pain. Dr. Irish was consulted and felt that claimant's symptoms might be related to the gallbladder and was considering gallbladder removal in July 1994. (Tr. 144.) Lactose intolerance also was consid-

ered (Tr. 140), though on May 12, 1995, Dr. Pausig again referred to the problem as IBS (Tr. 139).

**6.** May 31, 1996 and July 2, 1996, Dr. Pausig again saw claimant for "bursitis/tendinitis, posterior neck and shoulder region." (Tr. 136, 217.)

ing. (Tr. 59.) In 1996, claimant had total knee replacement, leaving her knee feeling better than after the second surgery, although claimant testified that at the time of the hearing, she remained limited to two blocks of walking before stopping to rest. (Tr. 45)

Claimant also had trouble with her back, beginning with a sciatic nerve injury in the 1970's. (Tr. 45–46.) Her back problems continued in 1993, limiting her ability to stand for more than five minutes to accomplish household chores, although after five minutes of rest her back "calmed down." (Tr. 46)

Claimant testified that tendinitis afflicted her right arm, hand, and then shoulder, since 1984.[7] (Tr. 46.) The tendinitis made raising her arm "high" difficult and painful. (Tr. 46–47.) When questioned as to whether she continued to experience these symptoms in 1993, claimant replied, "I think I did." (Tr. 47.) Claimant also testified to having bursitis in her right shoulder, beginning around 1992. (Tr. 47.) The pain from the bursitis was alleviated by application of a heating pad. (Tr. 47.) The bursitis bothered her "for two to three weeks at a time, but not all the time" in the winter, making it difficult for her to lift and hold things in her right arm. (Tr. 47.) Claimant testified to being right-handed. (Tr. 47)

In 1993, claimant also experienced irritable bowel syndrome, ranging from diarrhea to constipation. (Tr. 48.) She experienced diarrhea two to three days per week, with one to three minutes' notice of needing to use the bathroom (Tr. 48) and one hour per day spent in the bathroom (Tr. 49). When she was feeling constipated, claimant spent 45 minutes in the bathroom in an eight-hour day. (Tr. 49.)

Claimant also experienced daily muscle spasms in 1993 when she lifted objects or stood without moving. (Tr. 49.) The spasms typically lasted until she sat down and elevated her feet, with the spasms diminishing after about 10 minutes. (Tr. 49.)

Claimant testified to weighing about 300 pounds in 1993 and estimated that she weighed 340 pounds at the time of the hearing. (Tr. 51.) Claimant also suffered from allergies in 1993, ranging from being a major nuisance in the summer to being a minor nuisance in the winter. (Tr. 50.) She had crying spells in 1993 at least three times a week for five or ten minutes each time. (Tr. 55.)

When she was babysitting in 1993, claimant would rest in a recliner three or four times a day, for one-half to one hour each time. (Tr. 55–56.) In 1993, claimant felt that 10 minutes would be a long time to stand up at one time without taking a break. (Tr. 56.) Given the opportunity to take breaks as frequently as desired, claimant estimated that she would bé able to stand or walk one to two hours out of an eight-hour day. (Tr. 56.) She stated that she would be able to spend about one hour sitting in an office chair before having to take a break and could sit for six hours in an eight-hour day. (Tr. 57.)

In 1993, claimant had a driver's license and was able to drive. (Tr. 61.) Until 1996, claimant bowled once a week, though her average score decreased. (Tr. 64.) She went grocery shopping weekly in 1991 and "up until the worst part of '93 probably still once a week," after which her husband began grocery shopping more often. (Tr. 64–65.) In 1991 and 1992, claimant went shopping (other than grocery shopping) "quite often." (Tr. 65.) In 1993, she would shop for 30–40 minutes "if they had a basket I could hold onto." (Tr. 65.)

Claimant babysat for Wallace, her daughter, from 1991 to 1993. (Tr. 64, 67.) Wallace testified that walking two blocks at a time would be a long way for claimant to walk in 1993 and that she could see "the pain in [claimant's] face." (Tr. 67.) Wallace estimated claimant's pace to be 50

---

7. Dr. Pausig's notes all refer to tendinitis/bur- sitis only with respect to the left shoulder.

percent of that of a normal person. (Tr. 70.) According to Wallace, claimant shopped "for a little while before she would need to stop because she was in pain" and sat while doing the dishes (followed by 10 to 15 minutes of rest). (Tr. 68.) Wallace further testified that claimant bowled between 1991 and 1993 and occasionally attended church with Wallace. (Tr. 72.)

Wallace also testified that she felt that claimant was frustrated and depressed, crying for 10 minutes on the phone two or three times a month. (Tr. 70.) In addition, claimant was cranky three to four times a month in 1993, more often than in 1990 and 1991. (Tr. 71.)

Claimant's husband, Vick, stated that claimant experienced pain in her right knee in 1993, walking one-half block before stopping to rest. (Tr. 73.) Vick believed that claimant was bothered by pain 75 to 80 percent of the time and that her pace in 1993 was 50 to 75 percent less than normal. (Tr. 74.) Vick testified that claimant did house work for 10 minutes at a time, followed by 20–30 minutes of rest. (Tr. 74.) Claimant cried for five to ten minutes at a time, two or three times a month in 1993; she also became irritated two times a month for four to five hours each time. (Tr. 75.)

Vick and claimant vacationed twice between 1991 and 1993, once in Reno and once in California. (Tr. 76.) The California vacation lasted about two weeks and included two days' driving by car to Los Angeles with rest stops every two to three hours. (Tr. 76–77.) The couple also took a couple of overnight trips by car. (Tr. 77.)

Claimant and Vick were on a bowling league together between 1991 and 1993, bowling "at least once a week." (Tr. 77.) They bowled three games per outing, with the season lasting 35 weeks, except for three to four months following knee surgery. (Tr. 78.) Vick noted that claimant's

average score did decrease in 1992 and 1993 to 120 or 130, from 140 in 1991–92.[8] (Tr. 78, 79.) Between frames, claimant would sit down and elevate her leg. (Tr. 78.)

## DISCUSSION

Claimant argues that the ALJ erred in (1) finding claimant's testimony not credible, (2) rejecting lay witness testimony as not credible, (3) finding that claimant has no severe impairment, and (4) finding claimant not impaired under Listing 9.09.

### 1. The ALJ's Assessment of Claimant's Credibility

 Claimant argues that the ALJ improperly rejected claimant's testimony, and the testimony of lay witnesses, regarding the severity of claimant's impairments. Claimant must show only that her impairment "could reasonably have caused some degree of the symptom"; a showing of the severity of the symptom is unnecessary. *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir.1996) (citing *Orteza v. Shalala*, 50 F.3d 748, 749–50 (9th Cir.1995); *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir.1989)). In evaluating claimant's symptom testimony, "the adjudicator must give full consideration to all of the available evidence, medical and other, that reflects on the impairment and any attendant limitations of function." *Smolen*, 80 F.3d at 1285 (quoting SSR 88–13).

 Where there is no evidence of malingering and the claimant meets her burden of proving a causal relationship between the existence of an impairment and some level of symptoms, the ALJ must provide clear and convincing reasons for rejecting the testimony. *See Smolen*, 80 F.3d at 1281–82. The ALJ may not reject symptom testimony simply because it is not fully corroborated by objective medical findings. *See Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir.1986). The ALJ may disregard self-serving state-

---

**8.** By the time claimant quit bowling in 1996, her average had declined to 115.

ments which cannot be substantiated. *See Hudson v. Bowen*, 849 F.2d 433, 434 (9th Cir.1988) (citing *Taylor 'v. Heckler*, 765 F.2d 872, 876 (9th Cir.1985)).

■ The ALJ may rely on certain types of evidence in determining whether claimant's testimony regarding the *severity* of her symptoms is not credible. *See Fair*, 885 F.2d at 603–04. For ·instance, the ALJ may employ ordinary means of evaluating credibility (e.g., reputation as a liar, prior inconsistent statements), inadequately explained failure to seek treatment or follow a prescribed course of treatment, and claimant's daily activities. *See Smolen*, 80 F.3d at 1284 (9th Cir.1996) (citing *Fair*, 885 F.2d at 602–04; *Orteza*, 50 F.3d 748, 750 (9th Cir.1995); *Bunnell v. Sullivan*, 947 F.2d 341, 346–47 (9th Cir.1991) (en banc)). Claimant's testimony regarding the severity of her symptoms should not be discredited "merely because they are unsupported by objective medical evidence." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir.1998) (citing *Bunnell*, 947 F.2d at 343).

In addition, the ALJ must consider the factors set out in SSR 96–7p in evaluating the credibility of symptom testimony generally. *See Bunnell* 947 F.2d at 346 (citing *Luna v. Bowen*, 834 F.2d 161, 165 (10th Cir.1987)). These factors include the claimant's work record, observations of treating or examining physicians and other third parties, precipitating and aggravating factors, functional restrictions caused by the symptoms, and claimant's daily activities. *See* SSR 96–7p.

■ On review, the court gives great weight to the ALJ's credibility assessment, because credibility determinations are the province of the ALJ. *See Fair*, 885 F.2d at 604; *Anderson v. Sullivan*, 914 F.2d 1121, 1124 (9th Cir.1990) (stating "the ALJ's assessment of credibility must be given great weight").

Claimant argues that the ALJ should not have rejected her testimony as inconsistent because the activities in which she engaged were limited and not inconsistent with disability. In particular, claimant asserts that her ability to babysit during most of the period in question is not beyond her expressed limitation of being able to walk one to two blocks; she further argues that she discontinued this activity in 1993. Claimant likewise argues that bowling once a week is consistent with the ability to stand two hours per day. She further suggests that rather than discrediting her, this candid testimony should improve claimant's credibility. Claimant further notes that although she grocery shopped once a week, she reduced this activity in 1993 and, again, rather than discrediting her, the ALJ should have been impressed with claimant's candor.

Claimant also argues that her vacations should not discredit her pain testimony, because disabled persons can take vacations. *See, e.g., Fair*, 885 F.2d at 603 (citing *Howard v. Heckler*, 782 F.2d 1484, 1488 (9th Cir.1986) (finding occasional restricted travel not inconsistent with pain-induced disability)). Finally, claimant corrects the ALJ's mention of claimant's work as a church secretary. Claimant's daughter, not claimant, was a church secretary. (Tr. 69.)

■ Engaging in activities, including household chores, is not necessarily inconsistent with a finding of disability. *See, e.g., Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir.1984) (awarding benefits despite claimant's ability to cook meals and wash dishes); *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir.1987) (stating that ability to "assist with some household chores was not determinative of disability"). However, if the claimant spends a "*substantial* part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit an allegation of disabling excess pain." *Fair*, 885 F.2d at 603 (emphasis supplied). Thus, if claimant is capable of performing activities, including household chores, "that involve many of

the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from working." *Id.*

█ Where claimant's ability to engage in activity is inconsistent with her asserted limitations, the activity bears upon claimant's credibility. *See Reddick,* 157 F.3d at 722. If claimant's activity is in harmony with her disability, the activity does not necessarily indicate an ability to work. *See id.*

█ The ALJ concluded that claimant's testimony regarding the impact of her impairments on her ability to work was "not entirely credible." (Tr. 28.) The ALJ reasoned that claimant had been capable of babysitting for one, then two, infants three to five days a week during most of the period under review, demonstrating a capacity for caring for children. (Tr. 28.) Although claimant's earnings from babysitting fell just short of substantial gainful activity, the activity did constitute a "substantial part of [her] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting" and was, therefore, grounds for discrediting claimant's allegations "of disabling excess pain." *Fair,* 885 F.2d at 603. The ALJ further notes that claimant's capacity to bowl and shop regularly, as well as to go on vacations, support his finding that claimant did not suffer from a severe impairment during the period in question. (Tr. 28.)

Thus, in evaluating her credibility, the ALJ relied on evidence regarding claimant's activities. This is consistent with SSR 96–7p and with Ninth Circuit case law. *See e.g., Smolen* 80 F.3d at 1284 (citing *Fair v. Bowen,* 885 F.2d at 602–04). The ALJ's assessment of claimant's credi-

bility is based on substantial evidence and will not be disturbed.

**2. *The ALJ's Assessment of Lay Witness' Credibility***

█ Claimant contends that the ALJ improperly rejected lay testimony in reaching his decision. To the contrary, the record reflects that the ALJ accepted the testimony of claimant's husband and daughter and drew conclusions consistent with, and partially based upon, their testimony. (Tr. 25–26, 28.) Specifically, the ALJ recited lay testimony regarding claimant's ability to babysit, walk, complete household chores, and participate in leisure activities. (Tr. 25–26.) Thus, the ALJ's determination is not inconsistent with the lay testimony, and the ALJ was not required to explain his assessment of it any further.

**3. *ALJ's Step 2 Finding—No Severe Impairment***

█ Claimant maintains that she had a severe impairment or combination of impairments and that the ALJ's finding that she did not is based on improper legal standards and is against the weight of the evidence. A severe impairment is one that "significantly limits your physical or mental ability to do basic work activities." [9] 20 C.F.R. § 404.1520. An impairment is not severe when it has "no more than a minimal effect on [claimant's] physical or mental ability(ies) to perform basic work activities." SSR 85–28.

In support of her claim, claimant lists her impairments and the possible restrictions resulting from each. However, the record contains no objective medical evidence of the limitations imposed by her impairments; instead, claimant relies only on her own "not entirely credible" (Tr. 28)

---

**9.** Examples of basic work activities include "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; seeing, hearing, and speaking; understanding, carrying out, and remembering simple in-

structions; use of judgement, responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting." SSR 85–28.

testimony to establish the existence of a severe impairment.

The ALJ correctly determined that the medical record does not support a finding of severe impairment or combination of impairments. In fact, as evident from the medical evidence recited above, claimant was not examined for any of her claimed impairments (obesity, irritable bowel syndrome, left shoulder pain, knee pain) after, at the latest, April 1993.[10] Thus, because claimant's testimony is not completely credible and the medical evidence fails to substantiate her claim of severe impairment or combination of impairments, the ALJ's severity determination is consistent with the weight of the evidence.

### 4. ALJ's Step 3 Finding—No Listed Impairment

Claimant complains that the ALJ refused to consider whether claimant met the requirements for Listing 9.09A (Obesity) under 20 C.F.R. § 404, Subpart P, Appendix 1. Claimant further argues that it was the responsibility of the ALJ to contact claimant's physicians for the additional information required to substantiate a claim of disability under Listing 9.09A.[11]

The Commissioner must take "great care" in evaluating the severity requirement, SSR 85–28; thus, the ALJ considered the possibility that the claimant's obesity constituted a listed impairment under step three of the sequential evaluation (Tr. 28).[12] The ALJ concluded, however, that the lack of objective evidence regarding claimant's obesity precluded further assessment at this step. (Tr. 28.)

Claimant bears the burden of proving that her condition qualifies as a listed impairment. *See Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir.1995) (finding claimant not disabled due to obesity because she failed to carry the burden of showing she met the duration requirement for the listed impairment of obesity when she presented no evidence that her weight would remain above the listed impairment requirement for 12 months). While the record supports an inference that claimant is very large, claimant's evidence does not support a finding that she met the criteria for Listing 9.09A. Listing 9.09A requires a showing of height and weight, within the specified range, in conjunction with a "history of pain and limitation of motion in any weight-bearing joint or the lumbosacral spine (on physical examination) associated with findings on medically acceptable imaging techniques of arthritis in the affected joint or lumbosacral spine." 20 C.F.R. § 404, Subpart P, Appendix 1.

The medical record contains occasional references to claimant's size, and claimant estimated her weight and height in 1993 to

---

10. The medical record does not indicate that claimant ever sought medical treatment for obesity.

 Given the frequency with which claimant sought treatment for her various ailments (e.g., for her lower back pain, claimant saw Dr. Pausig July 29, August 9, and September 3, 1993 (Tr. 150, 151)), the lack of medical evidence around the last date insured regarding her alleged impairments is remarkable.

11. 20 C.F.R. § 404.1512(e)(1) states, "We will first recontact your treating physician or ... other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source ... does not contain all the necessary information ..."

12. Claimant did not include obesity as an impairment when filing her Disability Report. (Tr. 89, 112–30.) Under 20 C.F.R. § 404.1412(a), the Commissioner "will consider only impairment(s) you say you have or about which we receive evidence."

 Furthermore, in light of the recent Ninth Circuit opinion in *Meanel v. Apfel*, the court is concerned that claimant waived her right to appeal the issue of obesity by failing to raise the issue at the administrative hearing. 172 F.3d 1111,1115, (9th Cir.1999) (holding "at least when claimants are represented by counsel, they must raise all issues and evidence at their administrative hearings in order to preserve them on appeal").

be within the qualifying range for Listing 9.09A, though there is no objective evidence in the record of her height and weight during the relevant period.[13] More importantly, there is no medical evidence of arthritis within the relevant time frame as required for a showing under Listing 9.09A. While Dr. Pausig prescribed arthritis medication for claimant, at the same time and as late as February 1993, he also noted that "[s]he has been checked out for other forms of arthritis and these tests were normal in the past." (Tr. 153.)

Dr. Eilers provided the earliest documentation of the possibility that claimant suffered from arthritis on June 8, 1994 when he noted that claimant's "x-rays didn't show any significant abnormalities that I could see, maybe a little early arthritis, but other than that nothing much. I thought we would just treat her conservatively." (Tr. 187.) Indeed, the medical record is void of any indication claimant sought medical assistance for her knee from June 1990 until May 1994, when she hurt her knee deplaning. (Tr. 146–57, 187–90.) Thus, the record does not contain sufficient evidence to support a finding of obesity under Listing 9.09A in 1993 nor does it support an inference that medical evidence exists that would substantiate such a claim. The ALJ's determination that the record does not support a finding of disability due to a listed impairment thus is consistent with the evidence.

## CONCLUSION

Based upon a review of the record, the Commissioner's decision denying claimant DIB benefits is supported by substantial evidence on the whole record, contains no errors of law, and is, therefore, AFFIRMED.

---

**13.** Claimant estimated that she was 5'4 and weighed 300 pounds in 1993. (Tr. 51.) Listing 9.09A requires a weight showing of 258 pounds for someone with a height of 5'4.