**Ana RODRIGUEZ, Plaintiff**

v.

**Michael J. ASTRUE, Commissioner of the Social Security Administration, Defendant.**

**Civil Action No. 09–30050–KPN.**

United States District Court,
D. Massachusetts.

March 11, 2010.

Karen L. Goodwin, United States Attorney's Office, Springfield, MA, for Defendant.

Richard C. Roth, Law Office of Richard C. Roth, Springfield, MA, for Plaintiff.

*MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER (Document Nos. 14 and 16)*

NEIMAN, United States Magistrate Judge.

This is an action for judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") regarding an individual's entitlement to Supplemental Security Income ("SSI") pursuant to 42 U.S.C. § 1383(c)(3) (referencing 42 U.S.C. § 405(g)). Ana Rodriguez ("Plaintiff") asserts that the Commissioner's decision denying her such disability benefits—memorialized in an April 27, 2007 decision of an administrative law judge—is in error. She has filed a motion for judgment on the pleadings—seeking to reverse or remand the decision—and the Commissioner, in turn, has moved to affirm.

With the parties' consent, this matter has been assigned to the undersigned for all purposes, including entry of judgment. *See* 28 U.S.C. § 636(c); Fed.R.Civ.P. 73(b). For the reasons that follow, the Commissioner's motion to affirm will be denied and Plaintiff's motion, to the extent it seeks reversal, will be allowed.

## I. Standard of Review

A court may not disturb the Commissioner's decision if it is grounded in substantial evidence. *See* 42 U.S.C. §§ 405(g) and 1383(c)(3). Substantial evidence is such relevant evidence as a reasonable mind accepts as adequate to support a conclusion. *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir.1981). The Supreme Court has defined substantial evidence as "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Thus, even if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir.1991) (citation and internal quotation marks omitted).

The resolution of conflicts in evidence and the determination of credibility are for the Commissioner, not for doctors or the courts. *Rodriguez*, 647 F.2d at 222; *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 141 (1st Cir.1987). A denial of benefits, however, will not be upheld if there has been an error of law in the evaluation of a particular claim. *See Manso–Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir.1996). In the end, the court maintains the power, in appropriate circumstances, "to enter ... a judgment affirming, modifying, or reversing the [Commissioner's] decision" or to "remand [ ] the cause for a rehearing." 42 U.S.C. § 405(g).

## II. Background

Plaintiff, presently age forty-three, received a ninth grade education in Puerto Rico, a high school equivalency degree,

and several years of English as a second language, but has no past relevant work history. (Administrative Record ("A.R.") at 19, 102, 359–60.) She currently resides in Holyoke. The following sections briefly trace Plaintiff's medical history (most notably, her mental ailments) as well as the procedural background of this case.

### A. *Medical History*

Plaintiff was diagnosed with hyperthyroidism in 2003 and treated with medication that caused her to gain significant weight. (A.R. at 18, 103.) In addition, she has a history of joint complaints, tendinitis, lower back pain, and minimal degenerative osteoarthritis of her lumbar spine. (*Id.*) Plaintiff is also being treated for sleep apnea which prevents her from sleeping soundly through the night. (A.R. at 103.)

Plaintiff's mental ailments are profound, with evidence of significant depression as early as October 18, 2002. (A.R. at 103.) In November of 2003, Plaintiff was examined by a psychologist, Dr. Teena Guenther, who observed that Plaintiff's arms were "scarred up greatly" from self-mutilation. (A.R. at 280.) Plaintiff told Dr. Guenther that she had previously been hospitalized for suicidal ideation but that she would not follow through with any suicidal thoughts because of her responsibilities to her children. (A.R. 280–81.) [1]

Between 2003 and 2006, Plaintiff repeatedly sought treatment for anxiety, depression and chronic insomnia. (A.R. at 18.) Her doctors also noted the presence of auditory hallucinations and impaired concentration (A.R. at 192, 281–83, 333) and assigned Plaintiff Global Assessment of Functioning ("GAF") scores between 45 and 55 (A.R. at 193, 198, 200, 333). [2] In addition, Plaintiff reported suffering from panic attacks—which caused shortness of breath, sweats, palpitations and fear of dying—and, by January of 2006, advised that her "attacks" could occur up to four times a day, generally lasting less than one minute each. (A.R. at 190, 192, 200, 281 and 331.)

On May 31, 2006, Plaintiff's psychiatrist, Dr. Gastòn Baslet, prepared a "Psychological Functional Capacity" assessment report. (A.R. at 270.) At the time, Dr. Baslet had been treating Plaintiff for over six months. (A.R. at 198.) In his report, Dr. Baslet assessed Plaintiff as having "marked" limitations in her ability to perform many activities of daily living and maintain social functioning. (A.R. at 271.) He also opined that she had "marked" deficiencies in concentration and pace which results in "frequent failure to complete tasks in a timely manner." (*Id.* at 270–71.) In addition, Dr. Baslet deemed Plaintiff to be "extremely limited" in her ability to work either "a normal 8–hour workday" or a "40–hour workweek without interruptions from psychologically-based symptoms." (A.R. at 271.) He further noted a "marked" limitation in her ability

---

1. At the administrative hearing, Plaintiff testified that she was married in Puerto Rico at age fourteen and is now a widow (her husband having died a few years after their marriage) as well as the primary caretaker for her mentally-retarded adult son, the adoptive parent of her cousin's two adolescent children, and the legal custodian of two infant granddaughters. (A.R. at 360–63.)

2. "A GAF score represents 'the clinician's judgment of the individual's overall level of functioning.' The GAF score is taken from the GAF scale, which 'is to be rated with respect only to psychological, social, and occupational functioning.' The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death)." *Munson v. Barnhart*, 217 F.Supp.2d 162, 164 n. 2 (D.Me. 2002) (quoting DSM–IV–TR at 32, 34 (appendix)). *See also Walker v. Barnhart*, 2005 WL 2323169, at *4 n. 3 (D.Mass. Aug. 23, 2005).

to "maintain attention and concentration for extended periods," to "perform at a consistent pace without an unreasonable number and length of rest periods" and to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances." (*Id.*) Thereafter, Dr. Elaine Lehan–Fitzgerald, Dr. Baslet's replacement, noted that Plaintiff felt excessively sleepy during the day, continued to report panic attacks, exhibited neural slowness, felt anxious around other people and reported an inability to complete tasks in a timely manner. (A.R. at 288, 331–33.)

Meanwhile, Dr. Brian O'Sullivan, a state agency psychologist, reviewed Plaintiff's records on March 17, 2006, and concluded that she was "moderately limited" in her "ability to maintain attention and concentration for extended periods," to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (A.R. at 235–36.) Dr. O'Sullivan also noted the existence of "multiple factors contributing to energy and concentration variation including depression, pain and poor sleep which might have a physical cause." (A.R. at 237.) He further reflected that, while Plaintiff would generally be able to maintain a full time routine and adequate pace, during the later part of an eight-hour day her concentration and pace could be expected to vary as her "mood interacts with physical discomfort." (*Id.*)

On April 26, 2006, another state agency psychologist, Dr. Lawrence Langer, reviewed Plaintiff's records and similarly concluded that she was "moderately limited" in her ability to: "understand and remember detailed instructions," "carry out detailed instructions," "maintain attention and concentration for extended periods," "get along with coworkers or peers without distracting them or exhibiting behavioral extremes" and "respond appropriately to changes in the work setting." (A.R. at 265–66.) Dr. Langer concluded, *inter alia*, that Plaintiff should be able to "maintain attention for two hour intervals." (A.R. at 267.)

### B.  *Procedural History*

On February 10, 2006, in the midst of these benchmarks, Plaintiff applied for SSI disability benefits. After her application was denied both initially and on reconsideration, Plaintiff requested a hearing in front of an administrative law judge, which hearing was held on February 15, 2007. (A.R. at 14, 34, 36, 43.) Both Plaintiff and a vocational expert testified. (See A.R. at 352–81.)

In response to a hypothetical posed by the administrative law judge, Peter J. Martinelli, (hereinafter "ALJ"), the vocational expert first testified that an individual of Plaintiff's age, education and work experience—who was limited to sedentary work, indoors with no concentrated exposure to dust, fumes, strong odors, temperature, and humidity extremes, completing nothing more than rote tasks, involving limited interaction with co-workers and supervisors, and no interaction with the public—could perform work as a final assembler, a toy stuffer, and a ticketer. (A.R. at 376–78.) When the ALJ thereafter modified his hypothetical—to include factors limiting the individual's ability to maintain sufficient concentration, persistence and pace to stay on task for more than an hour—the vocational expert testified that no occupations would be available for such an individual. (A.R. at 378.) The ALJ then posed a third hypothetical, wherein the individual would need to be absent three or more times per month; the vocational expert testified that such a high rate of absence would lead to termination and,

therefore, such an individual could not work either. (A.R. at 378–79.) Plaintiff's attorney posed a fourth hypothetical which assumed "moderate" limitations in each of the areas noted by the state agency psychologists. (A.R. at 379.) Once again, the vocational expert testified that there would be no work for such an individual. (A.R. at 380.)

In his decision of April 27, 2007, the ALJ found that Plaintiff was not disabled. (A.R. at 14–21.) On February 19, 2009, the Commissioner's Decision Review Board denied Plaintiff's request for review, rendering the ALJ's decision final for present purposes. (A.R. at 6–9.)

### III. DISCUSSION

An individual is entitled to SSI benefits if she can show both disability and financial need. *See* 42 U.S.C. § 1381a. Plaintiff's financial need is not at issue.

### A. *Disability Standard and the ALJ's Decision*

The Social Security Act (the "Act") defines disability, in part, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to ... last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual is considered disabled under the Act

> only if [her] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work.

42 U.S.C. § 1382c(a)(3)(B). *See generally Bowen v. Yuckert,* 482 U.S. 137, 146–49, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

In determining disability, the Commissioner follows the familiar five-step protocol described by the First Circuit as follows:

> First, is the claimant currently employed? If [s]he is, the claimant is automatically considered not disabled.
>
> Second, does the claimant have a severe impairment? A "severe impairment" means an impairment "which significantly limits the claimant's physical or mental capacity to perform basic work-related functions." If [s]he does not have an impairment of at least this degree of severity, [s]he is automatically not disabled.
>
> Third, does the claimant have an impairment equivalent to a specific list of impairment in the regulations' Appendix 1? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled.
>
>  . . . .
>
> Fourth ... does the claimant's impairment prevent [her] from performing work of the sort [s]he has done in the past? If not, [s]he is not disabled. If so, the agency asks the fifth question. Fifth, does the claimant's impairment prevent [her] from performing other work of the sort found in the economy? If so [s]he is disabled; if not [s]he is not disabled.

*Goodermote v. Sec'y of Health & Human Servs.,* 690 F.2d 5, 6–7 (1st Cir.1982).

In the instant case, the ALJ found as follows with respect to these questions: Plaintiff has not engaged in substantial gainful activity since the alleged onset of her disability (question one); Plaintiff has several severe impairments, including morbid obesity, major depressive disorder and anxiety disorder with intermittent panic attacks, none of which, alone, or in con-

junction with the others, meets or medically equals one of the listed impairments in Appendix 1 (questions two and three); Plaintiff has no past relevant work (question four), but has the residual functional capacity to perform a range of sedentary work, so long as it is indoor work, with no concentrated exposure to dust, strong odors, fumes, temperature or humidity extremes, and it is limited to simple, unskilled work with no more than occasional interaction with coworkers or supervisors, and none with the general public (question five). Accordingly, the ALJ concluded that Plaintiff is not disabled.

### B. *Analysis of the Parties' Arguments*

In challenging the ALJ's decision, particularly his residual functional capacity assessment, Plaintiff makes two arguments. First, she argues that the ALJ failed to accord proper weight to the opinion of her treating psychiatrist, Dr. Baslet. Second, Plaintiff argues that the ALJ did not sustain his step-five burden of showing that there is other work in the national economy in which she could engage. The court agrees with Plaintiff in both respects.

### 1. *Dr. Baslet*

■ Plaintiff argues that, in making his residual functional capacity assessment, the ALJ failed to accord proper, if any, weight to the opinion of Dr. Baslet, her treating psychiatrist. The general rule is that an administrative law judge must "give more weight to the opinions from [the claimant's] treating physicians, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairments." 20 C.F.R. § 416.927(d)(2). The opinion of a treating physician typically receives controlling weight so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not incon-

sistent with the other substantial evidence." *Id.* If the opinion is inconsistent, however, either internally or with other evidence, the administrative law judge is free to "downplay" the physician's assessment. *Arruda v. Barnhart,* 314 F.Supp.2d 52, 72 (D.Mass.2004). Regardless of whether or not the administrative law judge decides to discount the treating physician's opinion, the decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record." Social Security Ruling ("SSR") 96–2p, 1996 WL 374188, at *5 (July 2, 1996).

Here, as noted, Dr. Baslet prepared a May 31, 2006 psychological report in which he assessed Plaintiff as having "marked" limitations in a number of areas, many of which focused on her inability to perform activities of daily living and maintain concentration, thereby impairing her ability to complete tasks in a timely manner. Dr. Baslet also deemed Plaintiff to have an "extreme" limitation in her ability to work "a normal 8–hour workday" or a "40–hour work week without interruptions from psychologically-based symptoms." (A.R. at 270–71.) If credited as "controlling," this evidence would have entitled Plaintiff to an award of SSI disability benefits based on the testimony of the vocational expert.

In his decision, however, the ALJ chose not to give Dr. Baslet's opinion any, let alone controlling, weight for what appears to be four reasons. First, the ALJ suggested that Dr. Baslet was inclined "to write reports sympathetically aimed at enhancing [Plaintiff's] ability to tap another source of income" inasmuch as she "is the primary caretaker for a mentally retarded 23 year old child,... an adoptive parent for her cousin's children, now 10 and 14 years old," and the occasional baby-sitter of "her grandchildren, ages 2 and 1." Second, the ALJ presumed that Dr. Baslet was "a mandated reporter [to the Depart-

ment of Children and Families ("DCF") ] for child neglect and abuse purposes" and opined that if Plaintiff were "so limited on an ongoing basis" as Dr. Baslet had determined, the doctor "would be remiss in not filing a[DCF] report seeking monitoring of [Plaintiff]'s role as a primary caretaker of a mentally retarded adult and two adopted adolescents." Third, the ALJ, citing *Burkhart v. Bowen,* 856 F.2d 1335, 1339 (9th Cir.1988), implied that Dr. Baslet's opinion was suspect because it was "solicited" by Plaintiff's counsel. And fourth, the ALJ deemed Dr. Baslet's opinion to be inconsistent with other record evidence; in this regard, the ALJ specifically referred to a document from January of 2007—in which Plaintiff's mood was described as "stable"—as being "particularly noteworthy." (A.R. at 19.) The court addresses these reasons in turn and, as will become evident, finds each one lacking if not disturbing.

### a. *The ALJ's First Reason*

With regard to the ALJ's suggestion that Dr. Baslet was inclined "to write reports sympathetically aimed at enhancing [Plaintiff's] ability to tap another source of income," there is simply no evidence in the record to support this conclusion. Perhaps more importantly, the court finds that it was inappropriate for the ALJ to engage in such speculation. *See Gilbert v. Apfel,* 70 F.Supp.2d 285, 290 (W.D.N.Y. 1999) ("In analyzing a treating physician's report, 'the ALJ cannot substitute his own judgment for competent medical opinion,' nor can [he] 'set his expertise against that of a physician who submitted an opinion.'") (quoting *Balsamo v. Chater,* 142 F.3d 75, 81 (2d Cir.1998)).

It should be noted that this is not the first case where this ALJ has seen fit to question the motivations of a treating physician in issuing a report. Thus, it is not the first time this court has seen fit to criticize him for basing a decision on inappropriate speculation. *See Brooks v. Barnhart,* 339 F.Supp.2d 183, 189 (D.Mass. 2004) (holding that statement which, in essence, accused doctor of perjury was "not only troubling, [but could] so taint a decision as to require a reward"); *Arroyo v. Barnhart,* 295 F.Supp.2d 214, 221–22 (D.Mass.2003) (applying "[c]loser scrutiny" to the ALJ's decision in light of "the taint of his impermissible justification"). Here, too, the ALJ's first reason for discounting Dr. Baslet's opinion was both unsupported and speculative and, hence, is deemed unavailing.

### b. *The ALJ's Second Reason*

Similarly misplaced is the ALJ's second reason for discounting Dr. Baslet, namely, that he should have reported Plaintiff to DCF if he truly believed Plaintiff was as limited as opined. As with the first reason discussed above, there is nothing in the record which reveals what Dr. Baslet did or did not report to DCF or what may have gone through Dr. Baslet's mind at the time. In short, the ALJ's gratuitous speculation is quintessential legal error. *See* 20 C.F.R. § 416.1453(a) ("The administrative law judge must base the decision on the preponderance of the evidence offered at the hearing or otherwise included in the record."). *See also* SSR 96–2p, *supra; Miles v. Chater,* 84 F.3d 1397, 1401 (11th Cir.1996) (holding that hearing was "compromised" when the administrative law judge made "observations ... with respect to the medical opinions, rendered by [the plaintiff's treating physician] for [the attorney]'s clients, without any evidence in support thereof").[3]

---

3. Perhaps more troubling, the ALJ cites no legal authority to support his apparent presumption that, if a claimant is disabled for purposes of SSI, she must, by default, be incapable of caring for her children. Such a presumption would have remarkable and in-

### c. *The ALJ's Third Reason*

■ The ALJ's third reason for discounting Dr. Baslet—implying that his opinion was suspect because it was "solicited" by Plaintiff's counsel—quickly withers as well. As this court has twice explained to this ALJ, basing a decision solely on such grounds is suspect:

> The ALJ's decision [to assign "little weight" to two treating physicians' reports] was based, in part, on his observation that both reports were "offered on solicitation of the claimant's representative, as an accommodation to [the] application." (A.R. at 28, 29.) Plaintiff contends that assigning little weight to these opinions on such grounds is an error at law, based as it was on an impermissible exercise of discretion.

As Plaintiff points out, the Ninth Circuit Court of Appeals entertained this very question in *Reddick v. Chater*, 157 F.3d 715 (9th Cir.1998). "[T]he mere fact that a medical report is provided at the request of counsel," the court stated, "or, more broadly, the purpose for which an opinion is provided, is not a legitimate basis for evaluating the reliability of the report." *Id.* at 726. The court held that, "in the absence of other evidence to undermine the credibility of a medical report, the purpose for which the report was obtained does not provide a legitimate basis for rejecting it." *Id.* Although it might be proper to reject a doctor's opinion letter that "varied from his treatment notes and 'was worded ambiguously in an apparent attempt to assist the claimant in obtaining social security benefits,'" the court explained, it was not proper to reject the opinion of a doctor simply because it was solicited by a claimant's attorney. *Id.* (quoting *Saelee v. Chater*, 94 F.3d 520, 523 (9th Cir.1996)) (in turn, citing *Lester v. Chater*, 81 F.3d 821, 832 (9th Cir.1995)).

As it turns out, the First Circuit previously reached a similar conclusion in *Gonzalez Perez v. Sec'y of Health & Human Servs.*, 812 F.2d 747 (1st Cir. 1987).... *Gonzalez Perez* criticized an administrative law judge for having assigned a doctor's report little weight because, in part, it was obtained "on advice and referral of counsel" after the disability claim was filed. *Id.* at 749. "In our view of social security disability cases," the court stated, "it appears to be quite a common procedure to obtain further medical reports, after a claim is filed, in support of such a claim." *Id.* Accordingly, the court directed, "[s]omething more substantive than just the timing and impetus of medical reports obtained after a claim is filed must support an ALJ's decision to discredit them." *Id.*

The instant matter falls comfortably within this line of cases. As in both *Reddick* and *Gonzalez Perez*, the ALJ here made clear that Plaintiff's counsel's solicitation of Dr. Nathan's and Ms. Miranda's reports factored into his decision to assign them "little weight."

*Arroyo*, 295 F.Supp.2d at 220–21. *Accord Brooks*, 339 F.Supp.2d at 189. As the court explained in *Brooks*, "it is not proper to reject the opinion of a treating physician simply because it was solicited by a claimant's attorney." *Id.*

Despite these rulings, the ALJ continues to cite in support of his "solicitation" reference a 1988 Ninth Circuit decision, *Burkhart*, that appears to have been undercut by the more recent *Reddick* decision, cited above. *See also Moss v. Astrue*, 555 F.3d 556, 560–61 (7th Cir.2009) (deeming "questionable" the discrediting of a treating source's opinions based on speculation, by the administrative law judge, that the opinions were solicited by the claimant's attorney); *Camerer v. Astrue*, 2008 WL

appropriate consequences for any number of SSI claimants.

1999583, at *7 (W.D.Wash. May 8, 2008) (citing *Reddick* for the proposition that "an ALJ may not reject a medical opinion solely on the basis for which it was obtained"). To be sure, as both *Reddick* and *Gonzalez Perez* make clear, an administrative law judge's decision can still pass muster if the other reasons given to accord medical reports little weight are adequately supported. *See Reddick,* 157 F.3d at 726; *Gonzalez Perez,* 812 F.2d at 749. But, as further explained below, the ALJ's decision here fails short in that regard as well.

### d. *The ALJ's Fourth Reason*

As his fourth reason, the ALJ suggested that there were inconsistencies between Dr. Baslet's report and Plaintiff's longitudinal medical history. The ALJ cited as "particularly noteworthy" a document from January of 2007 indicating that Plaintiff's mood was "stable." And now in support, the Commissioner asserts that "Dr. Baslet's pessimistic view of [P]laintiff's capacity *stands alone* in a record that otherwise reflects an individual with some limitations but a retained capacity for work-related activities." (Comm'r's Mem. Supp. Motion to Affirm at 13 (emphasis added)).

Were there, indeed, inconsistencies within the record, the ALJ, as indicated, would have been free to "downplay" Dr. Baslet's opinion. *See Arruda,* 314 F.Supp.2d at 72. The court finds, however, that the supposed "inconsistencies" are neither grounded in substantial evidence nor based on the ALJ's own, non-medical interpretation of Plaintiff's medical records.

To repeat, Dr. Baslet's May 31, 2006 psychological assessment found marked deficiencies in Plaintiff's concentration, persistence or pace, and an extreme limitation with respect to her ability to complete a normal 8–hour workday and 40–hour work week without interruptions from psychologically-based symptoms. (A.R. 270–71.) The Commissioner's present argument to the contrary, Dr. Baslet's assessment was actually consistent with his contemporaneous notes, with the assessments by other psychologists taken both before and after issuance of his report, and with the state agency psychologists as well.

#### (i) Dr. Baslet's Own Notes

Dr. Baslet began overseeing Plaintiff's treatment on September 21, 2005, when she had a GAF score of 55. (A.R. at 198.) Plaintiff went in again three months later when, as reflected in the medical notes, her panic attacks and anxiety had become more severe. (A.R. at 200.) A month later, in January of 2006, Dr. Baslet met with Plaintiff and noted both auditory and visual hallucinations, with panic attacks occurring between three and four times a day, albeit lasting less than a minute each. (A.R. at 192.) On February 27, 2006, Dr. Baslet again met with Plaintiff. (A.R. at 190.) Dr. Baslet noted that, while Plaintiff was responding well to medication with decreased sadness, she still experienced panic attacks, including shortness of breath, chest pain, dry mouth and a fear of dying. (A.R. at 190.) In the end, therefore, Dr. Baslet's contemporaneous notes are *consistent* with his ultimate conclusion that Plaintiff continued to suffer from psychological illnesses, including frequent panic attacks, which would interfere not only with her ability to concentrate but, as well, her ability to complete a normal workday or workweek.

#### (ii) Assessments by Other Psychologists

The ALJ also implied that Dr. Baslet's assessment was inconsistent with assessments by other psychologists. In particular, the ALJ noted that, prior to Dr. Baslet's treatment, Plaintiff had been observed by Dr. Guenther in 2003 as being "alert and oriented ... with attention and concentration only mildly impaired." (A.R. at 18.) This observation, however, was taken wildly out of context by the ALJ. The same treatment notes refer to

Plaintiff's auditory hallucinations, suicidal ideations, lack of motivation for performing routine tasks, as well as reported difficulties with anxiety and concentration. (A.R. at 281–82.) In addition, the ALJ neglected to acknowledge, let alone mention, that Dr. Guenther indicated that Plaintiff's "thought processes appeared restricted," that "[h]er affect was anxious, and her overall mood was dysthemic," that "[h]er recent and remote memory skills were found to be impaired," that "[h]er cognitive functioning was estimated to be in the borderline to below average range," that "[h]er insight was estimated to be limited," and that "[her][j]udgment was estimated to [be] fair." (A.R. at 282–83.) In other words, rather than *contradicting* Dr. Baslet's May 31, 2006 assessment, the 2003 medical records, viewed in their proper context, actually *support* Dr. Baslet's findings.

The notes of Dr. Lehan–Fitzgerald, who replaced Dr. Baslet, also substantiate Dr. Baslet's assessment. For example, in November of 2006, Dr. Lehan–Fitzgerald noted "neural slowness" and continued panic attacks. (A.R. at 331.) Similarly, Dr. Lehan–Fitzgerald reported the next month that Plaintiff was "unable to maintain concentration and is easily distracted," was unable "to complete tasks in a timely manner," and was experiencing "periods of helplessness." (A.R. at 333.) While there are scattered indications within Dr. Lehan–Fitzgerald's notes that medication was helping Plaintiff with some of her symptoms, Dr. Lehan–Fitzgerald's notes are consistent with Dr. Baslet's May 31, 2006 assessment. Despite this, the ALJ chose to conclude that "[Plaintiff's] symptoms appear to overall be adequately controlled with psychotropic medications." (A.R. at 19.)

The ALJ also took out of context statements of yet other medical professionals. For instance, the ALJ noted that in No-vember of 2005, Plaintiff was fully oriented within the context of a *physical,* not a psychological exam which did not explore problems such as anxiety or panic attacks. (A.R. at 18, 203–09.) Similarly, the "particularly noteworthy" comment that Plaintiff's mood was "stable" in January of 2007 (A.R. at 19) was made by a non-mental health physician who had merely commented that Plaintiff "states her moods are stable [and] ... has a follow-up appointment with [her psychologist] February 2, 2007." (A.R. at 342.)

(iii) The State Agency Psychologists

Finally, the state agency psychologists, Drs. O'Sullivan and Langer, corroborated many of the same symptoms noted by Dr. Baslet. (A.R. at 235–37, 265–67.) Yet these experts were virtually ignored by the ALJ. To be sure, these psychologists recognized only "moderate" limitations, whereas Dr. Baslet assessed such limitations as either "marked" or "extreme." However, as the vocational expert testified, even such moderate limitations would preclude occupations available to Plaintiff. (See A.R. at 379–80.)

(iv) Final Thoughts

■ The court recognizes that, in most situations, any conflict between a treating physician's opinion and other evidence in the record is to be resolved by the Commissioner. *Rodriguez,* 647 F.2d at 222. An administrative law judge, however, is not permitted to ignore the reports and opinions of examining and treating sources based on his own personal assessment unaided by any medical expert. *Nieves v. Sec'y of Health & Human Servs.,* 775 F.2d 12, 13 (1st Cir.1985); *Suarez v. Sec'y of Health & Human Servs.,* 740 F.2d 1, 1 (1st Cir.1984). Here, by discounting not only Dr. Baslet's opinion but also the corroborating medical records of Dr. Guenther, Dr. Lehan–Fitzgerald, and the agency psychologists in favor of elevating as "particu-

larly noteworthy" a reference to a "stable" mood by a doctor whose intent was never to treat Plaintiff's mental health, the ALJ, in effect, has replaced sound medical opinions with his own personal assessment. Given the remaining record, this obvious error is reason enough to grant Plaintiff relief.

### 2. *Failure to Sustain Step Five Burden*

■ Finally, Plaintiff argues that the ALJ did not sustain the Commissioner's step-five burden of showing that there were other types of substantial gainful activity in which she could engage. The court agrees.

■ In assessing a claimant's application for SSI disability benefits, the Commissioner bears the burden of proving at step-five of the protocol that there are jobs in the national economy that she can perform. *Hernandez v. Weinberger*, 493 F.2d 1120, 1122 (1st Cir.1974). Moreover, when, as here, there are non-exertional limitations that significantly erode the occupational base, the ALJ must obtain testimony from a vocational expert. *Heggarty v. Sullivan*, 947 F.2d 990, 996 (1st Cir. 1991).

As described, the ALJ here asked the vocational expert three different hypotheticals but, in the end, relied only on the vocational expert's response to the first, *i.e.*, whether there were any jobs in the national economy for a person who "is limited to indoor work, with no concentrated exposure to dust, strong odors, fumes, temperature or humidity extremes [and who] is limited to simple, unskilled work which requires no more than occasional interaction with coworkers or supervisors, and none with the general public." (A.R. at 20.) The vocational expert testified that such an individual would be able to work as a toy stuffer, ticketer, or final assembler. (*Id.*) Based on that answer, standing alone, the ALJ determined that Plaintiff was not disabled.

As Plaintiff argues, however, the Commissioner did not meet his step-five burden because the ALJ did not properly credit or analyze the vocational expert's testimony with regard to the second and third hypotheticals (posed by the ALJ) and the fourth hypothetical (posed by Plaintiff's attorney), which should have caused the ALJ to find Plaintiff unable to work. (A.R. at 378–80.) The ALJ not only failed to analyze the vocational expert's testimony with respect to these three hypotheticals—which were fully supported by Dr. Baslet, the state agency psychologists, and the other medical evidence of record—but simply ignored the testimony.

To be sure, the ALJ asserted in his decision that it was "beyond the ken of the vocational expert to relate 'moderate' restrictions to specific work limitation," yet he provided no support for that proposition. (A.R. at 19.) More problematically, this imposed limitation is inconsistent with the record. The ALJ's second hypothetical—which asked the vocational expert whether an inability to "maintain sufficient concentration, persistence and pace such as to stay on task more than an hour" would affect the ability to find gainful employment—actually reflected the "moderate" limitations noted by both agency psychologists, Drs. O'Sullivan and Langer (a moderate limitation to the ability to "maintain attention and concentration for extended periods"), as well as the marked limitation in the same area noted by Dr. Baslet. (A.R. at 235, 265, 271.)

In the end, it was the vocational expert's job to assess the vocational impact of specific non-exertional limitations. *Heggarty*, 947 F.2d at 996. *See Pratts v. Chater*, 94 F.3d 34 (2d Cir.1996); *Beckley v. Apfel*, 152 F.3d 1056 (8th Cir.1998); *Foreman v. Callahan*, 122 F.3d 24 (8th Cir.1997) (hold-

48

ing that an ALJ making the determination of the vocational impact of mental limitations "invaded the province of the vocational expert"). While the ALJ was not *bound* by the testimony of the vocational expert, he certainly needed to provide a basis for discrediting it. The justification the ALJ provided here—that it was beyond the ken of the vocational expert to determine the vocational impact of a number of specific moderate non-exertional limitations—is unsupported by either fact or law.

## IV. Conclusion

For the reasons stated, Plaintiff's motion, insofar as it seeks to reverse the Commissioner's decision, is ALLOWED while the Commissioner's cross-motion to affirm is DENIED. The Commissioner shall forthwith determine and pay the amount of SSI benefits due Plaintiff.

IT IS SO ORDERED.